**Denis HANLY et al., Plaintiffs-Appellants,**

v.

**John M. MITCHELL, as Attorney General of the United States, et al., Defendants-Appellees.**

**No. 791, Docket 72–1354.**

United States Court of Appeals.
Second Circuit.

Argued April 18, 1972.

Decided May 17, 1972.

---

Alfred S. Julien, New York City (Julien Glaser, Blitz & Schlesinger, Jesse A. Epstein, New York City, on the brief), for plaintiffs-appellants.

Milton Sherman, Asst. U. S. Atty., (Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York; Michael D. Hess, Asst. U. S. Atty., on the brief), for defendants-appellees.

Before WATERMAN, HAYS and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

This case raises important issues under the National Environmental Policy Act of 1969, 42 U.S.C. § 4331 et seq., a statute whose meaning is more uncertain than most, not merely because it is relatively new, but also because of the generality of its phrasing. Thus the Act recognizes "the profound influences of . . . high-density urbanization . . . [and] the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," and declares it the "continuing responsibility of the Federal Government to use all practical means . . . to . . . assure for all Americans safe, healthful, productive and esthetically and culturally pleasing surroundings." To achieve that and similar objectives, the Act sets up a system of procedures for federal agencies to follow in making decisions that might have an impact on the environment. The basic issue before us is whether the Act was complied with in the planning for a nine-story federal jail in back of the United States Court House in Manhattan, just across the street from two large apartment buildings. Plaintiffs, who include some owners of these apartments, allege that defendants violated the Act. Excavation on the project began in mid-February 1972, and a short time later plaintiffs sought a preliminary injunction in the United States District Court for the Southern District of New York against further construction work. On March 17, 1972, Judge Charles H. Tenney denied the injunction. Since the matter was urgent, we expedited the appeal. Because we believe that defendants have failed to comply adequately with the Act, we reverse in part the order of the district court.

I

Plaintiffs, including Reverend Denis Hanly, Pastor of Transfiguration Church, 29 Mott Street, sue for themselves and on behalf of a class of "residents, merchants, businessmen, institutions, religious organizations and other members of the public living within the area." Plaintiffs are all members of the Chatham Square Civic Committee for a Planned Community, a non-profit group concerned with the development and protection of that portion of lower Manhattan called the Civic Center. Although that area contains many government buildings, including several courthouses, surprisingly at least 50,000 people live there and in adjacent Chinatown. Included in that group are over 3,000 persons living in approximately 660 co-operative apartments in two buildings called Chatham Towers and Chatham Green. These directly face the proposed new jail, some 100–150 feet away. The apartments, constructed in the last decade, have many individual terraces, and there are lawns and play areas around the buildings.

The principal defendant is the United States; plaintiffs have also joined as defendants John M. Mitchell, as Attorney General,[1] Robert L. Kunzig, as Administrator of General Services, and Norman A. Carlson, as Director of the Federal Bureau of Prisons. The proposed con-

1. Mr. Mitchell is no longer Attorney General. But see Fed.R.Civ.P. 25(d) (1).

struction is called the Foley Square Courthouse Annex, but it actually consists of two nine-story buildings.[2] One, on the southerly portion of the site, will be a conventional office building containing about 127,000 square feet of interior space. It will house the relocated offices of the United States Attorney and the United States Marshal for the Southern District of New York and the Joint Strike Force Against Organized Crime. The other building, on the northerly portion of the site, will contain about 200,000 square feet and will be the Metropolitan Correction Center (MCC). Although plaintiffs formally attack the entire project, this building draws most of their fire. The MCC is designed to provide modern detention facilities for 449 prisoners, including an infirmary, a diagnostic center for psychiatric problems and a community treatment center for outpatients as well as inmates. Since the MCC is intended to replace the overcrowded and inadequate Federal Detention Center now located at West Street in Manhattan, it is probable that the new building will service not only prisoners involved in prosecutions in the Southern District but also prisoners from the Eastern District, and perhaps from New Jersey.

Plaintiffs seek to enjoin defendants from proceeding further with excavation and construction of both buildings and also pray for money damages. This appeal, however, concerns only the denial of preliminary injunctive relief. The theory of plaintiffs' complaint is that defendants were required by the National Environmental Policy Act to take certain preliminary steps before beginning excavation and construction and that they did not do so. Judge Tenney held that the General Services Administration (GSA) had considered "all of the environmental factors relevant to the construction of the Annex," and that GSA's conclusion that the Annex "will not have a significant adverse impact on the environment" was "not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." Judge Tenney further concluded that plaintiffs did not demonstrate a likelihood of success on the merits or irreparable harm if the injunction was not issued and that the balance of equities rested with defendants.[3] From those rulings plaintiffs appeal.

## II

Plaintiffs properly disclaim any attempt to argue before us the merits of the proposed building project. They concede that the question on appeal is not whether the proposed buildings adjoining this Court House should be built, but whether the requirements of the National Environmental Policy Act have been met. In their complaint and in the district court, plaintiffs' main argument was that defendants have not complied with section 102(2) (C) of the Act, 42 U.S.C. § 4332(2) (C), which provides:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and *other major Federal actions significantly affecting the quality of the human environment,* a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

---

2. Plaintiffs claim that at least one building will actually be 11 stories, but we do not regard that factual issue as significant on this appeal.

3. Unpublished memorandum dated March 17, 1971, at 13.

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes; [Emphasis added.]

Although this and other sections of the National Environmental Policy Act are innovative and place new and unusual responsibilities on government agencies, the legal questions before us fall into a familiar administrative law framework. We must identify the agency action to be reviewed, determine the applicable standard of review, and decide whether it has been met.

The agency determination under attack is the alleged conclusion of a "responsible . . . official" of GSA that under the *italicized language* quoted above, there was no need to make an "environmental impact" statement. Defendants argue that section 102(2) (C) requires such impact statements only when there are "major Federal actions significantly affecting the quality of the human environment." In the district court, defendants first claimed that building the Courthouse

Annex was not a "major" federal action, even though it involved two nine-story buildings and an expenditure of over $20,000,000. Later in the proceeding before Judge Tenney, however defendants conceded that the federal action was major, but argued that it would not "significantly [affect] . . . the quality of the human environment," and that therefore no environmental impact statement was necessary. This position is crucial to defendants' case because they concede, and the district judge pointed out, that no detailed environmental impact statement by a responsible official has been made pursuant to section 102(2)(C). However, Judge Tenney held that defendants' conclusion that there was no need for such a statement was justified.

■ There is no doubt that the Act contemplates some agency action that does not require an impact statement because the action is minor and has so little effect on the environment as to be insignificant. See Citizens for Reid State Park v. Laird, 336 F.Supp. 783 (D.Maine 1972); Echo Park Residents Comm. v. Romney, 3 E.R.C. 1255 (C.D.Cal. May 11, 1971). There is, however, a further question of statutory construction. Plaintiffs argue that if a federal action is "major," as defendants now concede this one is, it must have a "significant" effect on the environment and call for an impact statement. Defendants claim that the term "major Federal action" refers to the cost of the project, the amount of planning that preceded it, and the time required to complete it, but does not refer to the impact of the project on the environment. We agree with defendants that the two concepts are different and that the responsible federal agency has the authority to make its own threshold determination as to each in deciding whether an impact statement is necessary. See S.Rep.No. 91–296, 91st Cong. 1st Sess. 20 (1969). See Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. 356 (E.D.N.C. 1972); Citizens for Reid State Park, supra, 336 F.Supp. at 789. We also agree that, contrary to plaintiffs' conten-

tion, the responsible agency here was GSA, not the Department of Justice or the Bureau of Prisons, for whose use the office building and new jail will be built. As the agency responsible for the acquisition of the site, the design and construction of the buildings, and their ultimate operation, GSA was the appropriate body to make the original determination as to environmental impact.

▆ Plaintiffs also claim that GSA concluded not that an impact statement was unnecessary, but that it was necessary, and that GSA thereafter fell short of meeting that obligation. This argument is primarily based on the use of the words "Environmental Statement" in the heading of the document GSA relies upon. Plaintiffs assert that GSA's changed position that an impact statement was not necessary came only after GSA's belated recognition that its memorandum would not be sufficient for such a statement. Although we have grave reservations about the thoroughness with which that document was prepared, we do not agree that defendants are, in effect, estopped from now arguing that no detailed impact statement was necessary. Of course, any written consideration of environmental impact can loosely be called an impact statement, or a mini-impact statement, but use of particular words cannot be determinative. The issue in this context is whether GSA decided that the full statement called for by section 102(2) (C) was unnecessary. We agree that GSA did so decide; whether that decision withstands attack is another matter, to which we now turn.

### III

GSA's entire determination regarding the Courthouse. Annex—including both office building and jail—is found princi-

4. Mr. Paduano is now Executive Assistant to the Regional Administrator, GSA, Region 2.

5. The other memorandum, by Commissioner A. F. Sampson, Public Buildings Service, dated April 29, 1971, also concluded that

pally in a memorandum dated February 23, 1971, of George M. Paduano, who was then Regional Director of the Public Buildings Service of GSA,[4] and, according to defendants, the proper official to make such a decision under GSA's regulations.[5] See GSA Order PBS 1095.1 issued to implement section 102(2) (C) of the National Environmental Policy Act. Since the memorandum is short and crucial to the decision on this appeal, we quote it in full:

FEB 23 1971

Assistant Commissioner,
Operational Planning—16

2PRR

Application of the National Environmental Policy Act of 1969 Relative to Foley Square Courthouse Annex— Project No. 31–0323

*Environmental Statement:*

In accordance with GSA Order PBS 1095.1 dated December 11, 1970 and in response to telephone request from your office on February 16, 1971 the following information is furnished in connection with the subject project:

The impact of the proposed action will have no adverse effects on the environment, including ecological systems, population distribution, transportation, water or air pollution, nor will it be any threat to health or life systems or urban congestion. These points are further amplified as follows:

1. It is our intention to connect with the existing New York utility services, including water supply, sewage disposal, solid waste disposal, storm water drainage, etc.

2. It is planned that the heating will be by purchase steam from Con Edison Company of New York (same as 26 Federal Plaza).

the Courthouse Annex was not "a major Federal action significantly affecting the quality of the human environment." This memorandum admittedly refers only to the proposed office building for the staff of the United States Attorney and others, and not to the jail.

3. Trash removal will be by commercial contract.

4. There will be no relocation of people involved as the proposed project is adjacent to the Foley Square Courthouse and only a short additional traveling distance by public transportation from the present Bureau of Prisons location at 427 West Street.

5. There will be no material impact at all on public transportation.

6. Number of people to be housed in the Bureau of Prisons operation is given as 405.[6]

7. Zoning—C6–1.

8. We intend to follow the existing zoning regulations.

(Signed) G. M. PADUANO

G. M. PADUANO
Regional Director

INFO COPY: S. Bolen
Project Coordinator . . . .

cc: Official File—2PRU
Reading

---

This document is terse, to say the least. Nonetheless, for the purpose of supporting GSA's determination that the proposed office building portion of the Courthouse Annex will have "no adverse effects on the environment," we believe, as did the district judge, that the document is sufficient. True, the memorandum fails to mention aesthetic and architectural considerations, but in a neighborhood such as this with public buildings of wildly varying architecture, we cannot say that failure to mention explicitly such considerations is a vital flaw. Further, as the Sampson memorandum makes clear, see note 5 *supra*, "The building will house 357 people, most of whom are already employed in the same general area." At the same time, the space vacated by the United States Attorney in this Court House will apparently be used principally for courtrooms, not for additional offices. Finally, the area is already characterized by government buildings, including several courthouses and office buildings.[7] Thus, whatever the theoretical environmental impact of a nine-story office building may be, in this case the actual impact appears to be minimal and adequately accounted for in the Paduano memorandum.

The proposed jail, however, stands on a different footing. The Paduano memorandum does adequately discuss problems of water, heat, sewage and garbage. But those considerations apply to virtually any building. The memorandum contains no hard look at the peculiar environmental impact of squeezing a jail into a narrow area directly across the street from two large apartment houses. Indeed, there is not even a word about those apartment houses or the others located nearby. If GSA were planning a missile base on that site, a compact discussion of sewage, garbage, water and heat would hardly be adequate. Additional factors would have to be considered, and the same principle holds true here. Plaintiffs claim that the living environment of all the families in this area will be adversely affected by the presence of the jail and by the fears of "riots and disturbances" so generated. In particular, plaintiffs argue that the city prison formerly located at Sixth Avenue and Eighth Street has

6. Defendants concede that this figure is too low.

7. Defendants stress on appeal "the general character of the area as the nerve-center of the Federal, State, and City governments. . . ."

been vacated because the noise of the inmates, their demonstrations, and the beckoning and signaling between them and their visitors caused disturbances in the neighborhood. The Paduano memorandum contains no hint that such possible disturbances were considered. Nor is there any mention of the potential dangers of housing an out-patient treatment center in this area. Moreover, even as to more routine considerations, there is a conspicuous absence of a thoughtful discussion of possible traffic and parking problems caused by trucks delivering food and supplies, vans taking prisoners to and from the Eastern District and New Jersey courts, the need for parking space for prison personnel, and the need to accommodate those visiting the prisoners, whether lawyers or family.

■ Defendants argue to us that these are not "environmental considerations, as they are defined in" the Act and that the injuries plaintiffs envision are speculative at best. As to the latter point, it may be that some of plaintiffs' fears are vague and speculative, but clearly all of them are not and the "responsible official" of GSA has apparently never considered any of them. As to defendants' argument that plaintiffs' concerns are irrelevant under the Act, this assertion, characterized most charitably, is simply incorrect. The National Environmental Policy Act contains no exhaustive list of so-called "environmental considerations," but without question its aims extend beyond sewage and garbage and even beyond water and air pollution. See Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971); Goose Hollow Foothills League v. Romney, 334 F.Supp. 877 (D. Or.1971). The Act must be construed to include protection of the quality of life for city residents. Noise, traffic, overburdened mass transportation systems, crime, congestion and even availability of drugs all affect the urban "environment" and are surely results of the "profound influences of . . . high-density urbanization [and] industrial expansion." Section 101(a) of the Act, 42 U.S.C. § 4331(a). Thus, plaintiffs do raise many "environmental considerations" that should not be ignored. We believe the record in this case indicates that, as to the proposed jail, they were.

It is true that the Paduano memorandum states that "the impact of the proposed action will have no adverse effects on the environment, including . . . transportation, . . . nor will it be any threat to health or life systems or urban congestion." But in the context of an act designed to require federal agencies to affirmatively develop a reviewable environmental record, this perfunctory and conclusory language simply does not suffice, even for purposes of a threshold section 102(2) (C) determination. Cf. Greene County Planning Bd. v. FPC, 455 F.2d 412, 420 (2d Cir. 1972); City of New York v. United States, 337 F.Supp. 150, 159 (E.D.N.Y.1972) (3-judge court) (Friendly, C. J.). Nor does the February 1972 affidavit of Mr. Paduano submitted in this litigation make up for the deficiencies in his original memorandum. The 1972 affidavit still fails even to mention the residential community abutting the Annex site or to deal realistically with the full range of the jail's potential effects on that community. Moreover, the affidavit itself reflects much superficial reasoning. For example, the only support for the affiant's conclusion that the completed jail will not increase the burden on present public transportation facilities is the statement that the "approximately 450 residents" of the jail "obviously will not increase the burden on . . . public transportation." But plainly, the inmates will not govern themselves, nor will they cook their own meals or attend to the prison's administrative details. Others will do that and most will, presumably, come and go each day.

We hasten to point out that we do not suggest plaintiffs are correct in claim-

ing that the jail requires a section 102 (2) (C) impact statement. The area in back of the Court House may not be a residential area in the usual sense [8] and the entire Courthouse Annex may actually be an improvement in the area—jail and all.[9] Also, GSA is obviously not required to give the same weight to plaintiffs' concerns as plaintiffs do. But the essential point is that GSA must actually consider them. See generally Calvert Cliffs' Coordinating Comm., Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Greene County Planning Bd. v. FPC, *supra.*

■ Having come this far, we are aware that we have not yet considered one of the issues we noted at the outset of this discussion: the proper scope of judicial review of the agency action. Defendants argue that our only task is to see whether the agency determination was arbitrary or capricious or an abuse of discretion, citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414, 91 S.C. 814, 28 L.Ed.2d 136 (1971); Goose Hollow Foothills League v. Romney, *supra;* and Echo Park Residents Comm. v. Romney, *supra.* Plaintiffs contend that the standard of review is more "liberal" in some ill-defined way, citing Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827 (D.C. Cir. Jan. 13, 1972); Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971) (3 ELR 1362); Natural Resources Defense Council, Inc. v. Grant, *supra;* Scherr v. Volpe, 336 F.Supp. 886 (W.D.Wis.1971). We see no need to enter the controversy at this stage.[10] See Scenic Hudson Preservation Conference v. FPC(II), 453 F.

2d 463, 467–469 (2d Cir. 1971). Even under the more limited test, we would reverse as to the proposed jail because it is "arbitrary or capricious" for an agency not to take into account all relevant factors in making its determination. Citizens to Preserve Overton Park, Inc. v. Volpe, *supra,* 401 U.S. at 416, 91 S.Ct. 814. Similarly, even under a more "liberal" test, we would affirm as to the proposed office building.

Accordingly, we affirm in part and reverse in part the district court order denying a preliminary injunction and remand the case for further consideration. Plaintiffs are entitled to a preliminary injunction against further construction of the proposed jail until such time as GSA has made a proper determination under section 102(2) (C), taking account of all relevant factors, of whether the proposed jail significantly affects the quality of the human environment. We do not agree with plaintiffs that GSA is barred from making that necessary preliminary determination now. Nor do we regard the remand as pure ritual because of the probability that GSA will reach the same conclusion as before. Preservation of "the integrity" of the new Act is an important consideration, see City of New York v. United States, *supra,* 337 F.Supp. at 160, lest the Act's "lofty declarations" amount to no more than that.[11] Moreover, we assume that the determination will be made in good faith after full consideration. If GSA again decides that no formal environmental impact statement is required because the quality of the human environment will not be significantly affected, the district court can review the question again. Cf. Citizens to Preserve

---

8. See note 7 *supra.*

9. The district judge found that the buildings formerly on the site were "eyesores" at best.

10. After finding that the determinations of Mr. Paduano and Mr. Sampson were not arbitrary or an abuse of discretion, the district court went on to say:

While it is an unnecessary finding, it would even appear that there is substantial evidence to support their conclusion.

11. Statement of the Act's principal sponsor, quoted in Calvert Cliffs' Coordinating Comm., Inc. v. AEC, *supra,* 449 F.2d at 1113 & n. 7.

Overton Park, Inc. v. Volpe, *supra*, 401 U.S. at 420, 91 S.Ct. 814. Should GSA decide that a formal impact statement is necessary, then the detailed procedures set forth in section 102(2) (C) will have to be followed. In any event, because of the urgency of the situation and the district court's finding on the balance of hardships, we suggest that the injunctive order be stayed for a short period of time, but no more than 30 days, to allow the necessary threshold determination of the jail's environmental impact to be made while the preliminary work on the construction site continues. Cf. City of New York v. United States, *supra*, 337 F.Supp. at 163–65; Goose Hollow Foothills League v. Volpe, *supra*, 334 F.Supp. at 880.

## IV

Plaintiffs also argue that defendants failed to comply with subsections (A), (B) and (D) of section 102(2) of the Act, 42 U.S.C. § 4332(2) (A), (B), (D), and point out that these sections do not contain the same limiting language of subsection (C) discussed above. According to plaintiffs, therefore, defendants were required to comply with these sections whether or not the proposed federal action had a significant effect on the environment. Defendants maintain that plaintiffs did not raise these issues in the district court and that, in any event, the requirements of these sections were satisfied. The district court did not deal with these questions, obviously because they were not seriously pressed below. Although the papers submitted to us by defendants on this issue are persuasive, we believe that the better procedure, in view of our remand, is for the district court to decide whether these sections are applicable and, if so, whether defendants met their requirements.

Judgment affirmed in part and reversed in part. Case remanded for further expeditious proceedings consistent with this opinion. The mandate shall issue forthwith.