**SIERRA CLUB**

v.

**John H. MASON, as Division Engineer, United States Army Corps of Engineers for the New England Division, and Robert F. Froehlke, as Secretary of the Army.**

**Civ. No. B-582.**

United States District Court,
D. Connecticut.

Oct. 31, 1972.

Haynes N. Johnson, Stamford, Conn., for plaintiff.

Howard C. Eckenrode, Asst. U. S. Atty., Bridgeport, Conn., for defendants.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This is a motion for a preliminary injunction in an environmental suit brought to enjoin the dredging of the New Haven, Connecticut, harbor and the deposit of the dredged materials into Long Island Sound because of the failure of the responsible federal agency to prepare an environmental impact statement pursuant to the National Environmental Protection Act (NEPA), 42 U.S. C. § 4332 et seq.

Plaintiff Sierra Club is a non-profit California membership corporation pledged to the preservation and proper management of this nation's natural resources. Some of its members are alleged to live on or near the shore in the area to be affected by the proposed dredging; others are alleged to use the waters in the area for recreational and commercial purposes. The defendants are the Division Engineer (New England) of the United States Army Corps of Engineers and the Secretary of the. Army.

The project involves the dredging of the harbor to its previous depth of 35 feet and the deposit of 720,000 cubic yards of dredged materials at a "dump site" in Long Island Sound. The chief environmental dangers foreseen by the plaintiff are the smothering of oyster beds located in the harbor by silt raised in the course of the dredging and a long-term threat of unknown proportions to the ecological vitality of Long Island Sound which may be created by the proposed dumping of polluted dredged material at a site in the Sound some six miles from the harbor.

Jurisdiction is asserted on a number of grounds, including those specified in 28 U.S.C. §§ 1331, 1337 and 1361. Defendants have not challenged this Court's jurisdiction. While the jurisdictional bases of NEPA suits have varied, the Second Circuit has predicated jurisdiction of a similar action upon the Administrative Procedure Act, 5 U.S.C. § 701 et seq., Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970). The alleged threat of environmental damage would also seem sufficient to satisfy the requirements of 28 U.S.C. § 1331, Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.Conn. July 7, 1972); Scherr v. Volpe, 336 F. Supp. 882 (W.D.Wis.1971).

Defendants have moved to dismiss for lack of sufficient standing by the plaintiff. Defendants also contend that relief should be denied because NEPA's impact statement requirement does not apply to "maintenance" of a project completed prior to the Act's effective date. Even if the Act applies, defend-

ants contend that no statement is required because the project is not one "significantly affecting the quality of the human environment" within the meaning of 42 U.S.C. § 4332(2)(C). Finally, defendants argue that the plaintiff has failed to establish grounds for issuance of a preliminary injunction.

The federal government began improving New Haven Harbor, now the third busiest in New England after Boston and Portland, in 1852 and has continued to do so over the years. On July 24, 1946 Congress enacted P.L. No. 525, 60 Stat. 634, which adopted the Corps of Engineers' recommendation for modification of the New Haven harbor channel to its present size. The improvements to the channel were carried out between 1948 and 1950, entailing removal of approximately eight million cubic yards of material.

Maintenance dredging in the main channel and nearby river channels has been carried out periodically since that time by the Corps of Engineers. Between 1955 and 1968 approximately two million cubic yards of material were removed during various maintenance operations. All dredged material (spoil) was disposed of at the New Haven "dump site" in Long Island Sound, the same site proposed for depositing spoil from the project here challenged by plaintiff.

As a result of a survey conducted by the Corps of Engineers' Operations Division in February and March, 1970, the Division determined that dredging was required to restore the New Haven harbor channel to its authorized depth of 35 feet to accommodate present navigational requirements. Funds for the performance of this work were requested to be included in the federal budget for fiscal year 1972. These funds were appropriated by Congress, pursuant to such request, in the annual appropriation for Civil Works, Operations and Maintenance. After bids were received, the contract for the project was awarded on June 29, 1972, at a price in excess of $1,000,000. At the request of Connecticut officials, the dredging operation was postponed until October 1, after the oyster spawning season, for fear that the dredging would upset this delicate process. With the filing of this suit on August 30, 1972, defendants agreed to delay any work pending disposition of the motions now under consideration.

### Standing

Relying on Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the "Mineral King" case, defendants contend that plaintiff lacks standing to bring this action because it has failed to allege injury in fact.[1] In "Mineral King" the Sierra Club had contended that the Club's long-standing concern with and expertise in matters involving the use of natural resources were sufficient to give it standing as a "representative of the public." The Supreme Court rejected this argument, holding that standing requires that "the party seeking review be himself among the injured." 405 U.S. at 735, 92 S.Ct. at 1366. However, the Court also noted that

"nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any pur-

---

[1]. Injury in fact is the first part of the two-part test for standing set out by the Supreme Court in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed. 2d 192 (1970). The second part of the test, which both parties agree is met in the present case, is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150 at 153, 90 S.Ct. at 830. The interest which the Sierra Club seeks to protect here—recreational, economic and educational enjoyment of the land and sea areas about New Haven harbor—are manifestly within the zone of interests to be protected by NEPA.

pose, much less that they use it in any way that would be significantly affected by the proposed actions of respondents." *Id.*

Implicit in this statement is the conclusion that such allegations as to the Club's *members* would have been sufficient to afford the Club standing in the action.[2]

In its complaint here plaintiff states that it is a non-profit California corporation pledged to the preservation, conservation and proper management of the nation's resources; that it has 140,000 members organized into 40 chapters; that many of its members reside in the vicinity of the area here in question, some on or adjacent to the shore of Long Island Sound, and use the area individually or in informal groups for various recreational activities, including hiking, photographing, fishing, sailing, and swimming; and that other members use the area commercially. Paragraph 3 of the complaint states explicitly that "each [of these members] would be directly injured economically or otherwise, by the actions of defendants herein complained of." These allegations are supported by an affidavit naming specific Club members and their uses of the area in question and stating that these uses would be injured by the action proposed by defendants.[3]

Defendants' initial response is that plaintiff's failure to join its *members* as parties is fatal to its cause of action, since all the allegations of injury in fact concern injury to Club members, not to the Club as an entity. But in "Mineral

King" the Court nowhere suggested that the Club as a single party plaintiff could establish standing only where it alleged injury in fact to its *group* activities. Rather the Court took just the opposite position, stating: "it is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." 405 U.S. 727 at 739, 92 S.Ct. 1361 at 1368.

Such injury to Club members is clearly alleged in the complaint and is sufficiently supported by affidavit for purposes of the motion for preliminary injunction.

Defendants' second contention is that plaintiff has not shown that the proposed dredging and dumping will adversely affect the activities of plaintiff's members. "Mineral King" did suggest that injury in fact requires not only use of the affected area by plaintiff but also some impact upon that use by the proposed federal action. 405 U.S. at 735, 92 S.Ct. 1361.[4]

The extent and specificity of allegations necessary to establish this second aspect of injury in fact will vary from case to case. In some cases, the effect of the proposed action on plaintiff's interests will be immediately self-evident, making unnecessary specific allegations of how injury might occur. Thus in "Mineral King" the Court implied in a footnote that allegations in an *amici* brief that the Club and its members *used* the Mineral King valley for recreational purposes would be sufficient to meet the injury-in-fact test. 405 U.S. at 735, 92 S.Ct. at 1366, n. 8. In that case,

---

2. The Court indicated that the Club could amend its complaint in the District Court to allege such an interest in it or its members, 405 U.S. 727 at 735, 92 S.Ct. 1361, at 1366, n. 8, and the Club has done so. *See* Memorandum of Decision on Plaintiffs' Motion to Amend Complaint, Sierra Club v. Morton, No. 51464 (N.D.Cal. July 6, 1972).

3. Paragraph 4 of the complaint makes the general allegation that "The aesthetic, environmental and recreational interests of the Club, its chapters and its members

would be injured by the failure of the defendants to comply with the provisions of the National Environmental Protection Act."

4. *See also* Alameda Conservation Association v. State of California, 437 F.2d 1087 (9th Cir. 1971) and Sierra Club v. Leslie Salt Co., No. 72–561 (N.D.Cal. Oct. 13, 1972), both of which point out the need for allegations indicating the connection between defendant's acts and the interests plaintiff seeks to protect.

the challenged action—commercial development of a wilderness area—*necessarily* would have affected plaintiff's interests, since the essence of those interests was enjoyment of wilderness areas.

■ The nexus between some uses of a given area by a plaintiff and the effect of defendant's proposed actions may be more tenuous in other cases, such as the present one.[5] This does not necessarily mean, however, that the nexus must be explicitly elaborated in the pleadings; it is sufficient that a connection be reasonably inferable from the facts alleged. It may well be that a connection sufficient to establish standing can be inferred once the pleadings locate a plaintiff (or, here, a club member) in a given environmental context through his recreational or economic activities or residence and allege that the proposed federal action threatens the quality of that environment. This test may be especially appropriate in instances where little is publicly known about the environmental impact of the challenged action and where plaintiff sues to require an impact statement. To oblige him to allege more than a generalized, non-frivolous threat to the environment in which he lives, works or plays might, in some cases, require him to state what has not yet been determined but what may be detailed in the environmental impact statement he wants prepared.

It is not necessary to go so far here, however, for many of the specific uses of the New Haven harbor area and Long Island Sound by plaintiff's members—especially swimming and fishing—are readily seen to be subject to injury by defendants' proposed actions. These uses would be injured, for instance, if materials toxic to marine or human life were dredged from the harbor floor and dumped into the waters of the Sound used for swimming and fishing.

■ Accordingly, plaintiff has adequately established its standing in this suit.

### Coverage of NEPA

■ Defendants claim that the challenged dredging project, which they concede is "a major federal action" within the NEPA definition, is nonetheless exempted from the Act because it is "maintenance" of a harbor built in 1871 and improved to its 35-foot depth between 1948 and 1950. They argue as if there were some exception in the Act for maintenance projects. Of course, there is not. Nor is it likely that when Congress made NEPA effective for all major federal actions taken after January 1, 1970, it thought it was exempting every type of maintenance activity which federal agencies might deem necessary for facilities built before that date. The fallacy of defendants' position is disclosed in their contention that when maintenance work is undertaken, the only significant agency decision is when to do the work, not whether to do it.[6] Overlooked is the crucial decision as to how the work is to be done. When the maintenance action requires disposal somewhere of more than one million tons of polluted materials, it should be obvious that determining the method and location of such disposal requires the most careful consideration of alter-

---

5. It is not apparent, for instance, how dredging New Haven harbor to a depth of 35 feet will injure plaintiff's members' interest in photographing the region.

6. It may well be that NEPA's requirement of weighing alternatives does affect maintenance projects in a different way than new construction projects when the agency considers *whether* the project should be undertaken. Presumably, where a large and important facility exists prior

to NEPA, an agency will not have to devote much of an impact statement to demonstrating that the facility should be maintained. But even this issue will sometimes present significant alternatives requiring analysis. For example, some maintenance of New Haven harbor may be obviously required, but it may be less obvious whether the needs and the environmental damage in meeting those needs are best balanced by dredging to 35 feet or to some lesser depth.

natives. NEPA requires that this consideration be given in a systematic way before the project is undertaken.

Moreover, the proposed dredging does not even meet the "maintenance" exception to NEPA which the Corps of Engineers' regulations purport to create. E. R. No. 1105–2–507, January 3, 1972. Sections 5(f) and (j) of the regulations define operation and maintenance projects and require that environmental impact statements concerning such projects "be submitted in order of priority over a 3-year period" after NEPA's effective date with "those projects having the greatest impact upon the environment and those projects where proposed actions are such as to preclude the possible adoption of alternative plans" given highest priority.

But even these provisions do not exempt the New Haven project from NEPA. Section 5(f) clearly deals with a completed project in which, unlike the New Haven harbor, maintenance is ongoing. Further, § 5(f)(1) emphasizes that maintenance not included in an initial project description does require an impact statement. If classified as maintenance in any way, the New Haven operation falls within § 5(f)(2)(b) which excepts "Projects where only infrequent maintenance is performed" but provides that "Statements may be deferred *until request of funds for maintenance.*" (emphasis added).

The New Haven harbor is such a project. The record of New Haven dredging from 1948 (Exhibit E, Andreliunas Affidavit) indicates that no dredging to the extent now proposed has been done since 1958 and no dredging at all since 1968, when only 2,150 cubic yards were removed. The funding request as well as the planning and opening of bids for the current operation all took place after NEPA's effective date, January 1, 1970. (Andreliunas Affidavit, ¶¶ 21–22). Yet no impact statement was prepared at the time of the funding request as required by § 5(f)(2)(b) of the regulation or at any subsequent time.

Defendants next contend that if not exempted from NEPA as a maintenance project, the proposed dredging can be considered an "ongoing project" to which NEPA applies less strictly than where a project originates after the Act's effective date. Where considerable agency action has occurred prior to the Act's effective date, courts have applied a balancing of factors approach to determine if an impact statement is required for some remaining stages of a project. *See* Conservation Society of Southern Vermont v. Volpe, 343 F.Supp. 761, 766–767 (D.Vt.1972); Environmental Law Fund v. Volpe, 340 F.Supp. 1328, 1335 (N.D.Cal.1972).

But just as a "maintenance" exception would undermine the Act, so would a special rule that considers maintenance simply a later stage of all projects built before January 1, 1970. This proposed dredging project entirely post-dates the effective date of NEPA. All of the planning, preparation of specifications, and solicitation of bids occurred after January 1, 1970. Though obviously related to the previously completed project of building the harbor, this dredging project has a life of its own. Since the project, in and of itself, has the potential for harm to the environment, it is precisely the type of project for which NEPA requires the preparation of an impact statement.

Finally, defendants contend that even if the Act applies, an impact statement is not required because the project will not significantly affect the environment. The situation here, however, is quite unlike that considered by the Second Circuit in Hanly v. Mitchell, 460 F.2d 640 (2d Cir. 1972). In *Hanly*, a memorandum prepared by a regional director of the Public Buildings Service of the General Services Administration was deemed sufficient to establish that a proposed office building would not have a significantly adverse effect on the environment so as to require an impact statement. His memorandum was also held inadequate to support the same con-

clusion with respect to a proposed jail facility.

*Hanly* involved a conclusion reached by the official designated in the agency's regulations as the appropriate official to make such a decision. 460 F.2d at 645. Here § 4(a) of the regulations seems to place that responsibility initially with the Division Engineer, yet the defendants rely instead upon an affidavit submitted by Vita Andreliunas, who is Chief of Operations Division. Moreover, his affidavit has been submitted in this litigation to justify the Corps' failure to prepare an impact statement, whereas in *Hanly* the memorandum found sufficient was submitted to a superior within the responsible agency in the normal course of the agency's consideration of its NEPA responsibilities.

Furthermore, the statement relied on here is simply not the type of conclusion found sufficient for the office building in *Hanly*, which stated unequivocally, "The impact of the proposed action will have no adverse effects on the environment. . . ." 460 F.2d at 645. The Andreliunas affidavit states, "studies and inquiries elicited nothing definitive to indicate that the maintenance dredging . . . and the disposal of the dredged materials . . . would result in significant environmental impact." Rather than express a conclusion that no adverse effect will occur, this statement, by relying on the present lack of "definitive" indications, fairly calls for the preparation of an impact statement so that the available evidence will by systematically gathered and reviewed in the manner which Congress has required.

■ Even if the Andreliunas affidavit could be considered a declaration by the appropriate official of no environmental impact, it would not suffice as a "threshold section 102(2)(C) determination" within the meaning of *Hanly*. 460 F.2d at 647. It clearly does not take into account "all relevant factors," 460 F.2d at 648. Moreover, such a conclusion could only be considered arbitrary in light of several facts in this record. Paragraph 11(b) of the Corps' regulation identifies "disposal of polluted dredged material in unconfined or open water areas" as a typical example of an activity that could have an adverse impact on the environment. The Conley affidavit, submitted by defendants, discloses that the Environmental Protection Agency itself urged preparation of an impact statement for this dredging project. Finally, an impact statement already prepared by the Corps for a proposed dredging of a side channel in the same harbor identifies several factors that will have an adverse impact on the environment.

■ In sum, the Act plainly requires the preparation of an impact statement for a project that proposes to dump into the open waters of Long Island Sound more than 1,000,000 tons of materials that contain pollutants in concentrations in excess of the guidelines promulgated by EPA.

*Injunctive Relief*

Since NEPA applies to this project, the failure to prepare an impact statement would normally justify injunctive relief unless, on balance, the equities advanced by both sides made such relief inappropriate. *Cf.* Committee to Stop Route 7 v. Volpe, *supra*. At issue now is the appropriateness of a temporary injunction. However, since the issues concerning the requirement of an impact statement do not appear to involve any disputed facts, the case may turn out to be in no significantly different posture than when the merits are formally reached, and the relief sought is a permanent injunction pending compliance with the Act. Moreover, the defendants seem to be contending that a temporary injunction will delay the project not simply until the merits are reached but until an impact statement, now being prepared, has been filed, since they believe that if any delay occurs, the present contractor will reassign his men elsewhere, and any new arrangements would take considerable time.

Defendants' claim is that substantial harm to the public will result if an injunction issues. The major source of this injury would be economic loss to the oil companies whose numerous tankers use the harbor. These tankers must presently be loaded to less than their full capacity in order to navigate the harbor channel safely. Such inefficient, and hence costly, light loading will have to continue, defendants' claim, until the channel is restored to a depth of 35 feet. The record does not indicate how long this light loading has occurred, thereby making it difficult to judge the relative significance of a short delay. Defendants also allege, although cursorily, that shoaling in the harbor has created a safety hazard, by narrowing the area in which ships may safely sail. However, no detail has been presented to support this claim. Finally, defendants claim any delay will result in increased costs to the government since they believe a resolicitation of bids would not produce a bid as low as the one already accepted. This claim is speculative and in any event would entail costs which the government could have avoided by compliance with the Act.[7]

Normally, a plaintiff seeking injunctive relief would have to specify the harm that would be avoided by the injunction. Plaintiff here does not allege *specifically* what harm injunctive relief would forestall, but argues that the dredging entails a *risk* of significant adverse impact on the environment. If the work is allowed to proceed, plaintiff claims the harm which will ensue, though now impossible to define precisely, will outweigh any harm caused by the delay itself.

■ In a narrow sense, plaintiff has detailed the "harm" by contending that without an injunction a major federal action affecting the environment will be undertaken without full consideration of environmental factors as required by NEPA. Only the preparation of an impact statement before the project is undertaken will avoid this "harm." It would be pointless, however, to permit such "harm" to justify an injunction in every case, since there may well be situations where the adverse consequences of delay are substantial and there is no sufficient likelihood that the preparation of an impact statement will serve the policies NEPA is designed to advance. No simple standard will suffice for all cases, but at a minimum it seems clear that in the absence of extraordinary equities on the government's side, the requirement of an impact statement must be enforced by an injunction whenever the proposed project poses a substantial risk of damage to the environment and there exists a reasonable possibility that adequate consideration of alternatives might disclose some realistic course of action with less risk of damage. Even if the responsible agency ultimately decides not to pursue such alternative course, the public disclosure of all the pertinent circumstances serves an important policy of the Act, and may well affect governmental decision-making in the future.

■ Applying this approach to the facts presented in the affidavits of both parties leads to the conclusion that injunctive relief is proper in the instant case. First the affidavits reveal that the magnitude of the environmental damage which the proposed project, and in particular the proposed off-shore dumping of spoil, entails is substantial, as is the likelihood that such damage will occur. The adverse effects of the dumping of polluted spoil, such as that

---

7. Defendants also claim that they may be liable for breach of contract to the contractor retained to perform the dredging, if the work is not allowed to proceed. Such possible liability, however, can be given only slight weight in the present balancing of equities for, if established, it would surely be more the result of a poorly drawn government contract which failed to provide for the contingency of unavoidable delay, than of any order of this Court.

from New Haven harbor,[8] are a recognized problem among environmental planners and have been the subject of a number of studies [9] and at least two major conferences.[10] Further, a conference concerning the pollution of Long Island Sound and its tributaries, held at New Haven, on April 13–14, 1971, specifically recommended that "The practice of depositing polluted dredged material in spoil areas of the open waters of Long Island Sound should be prohibited."[11] These recommendations have since been adopted by the Environmental Protection Agency.[12] Additional recognition of the present project's potential for causing significant environmental damage is found in a letter from Dr. Clifford V. Smith, Jr., the Deputy Regional Administrator of EPA to John William Leslie, Chief of the Engineering Division, Corps of Engineers, requesting that an impact statement be filed prior to the commencement of work on this project.[13] Finally, § 11(2)(b)(1) of the Corps' regulations expresses the Corps' own concern about the adverse environmental effect of dumping dredged materials in unconfined or open water.

In light of this substantial accord among experts in the field,[14] including what are, in effect, admissions by de-

fendants regarding the dangers of projects like that now under consideration, it is not necessary here to sift through the extensive array of scientific data on the subject and identify *specific* environmental dangers whose impact is sufficiently great and sufficiently likely to occur to establish plaintiff's claim of harm. The danger is recognized by authorities in the field.

These authorities also establish that numerous techniques exist for substantially reducing the adverse environmental impact of dredging and dumping operations, and that many factors must be weighed before a determination can be reached as to the safest way to dispose of the spoil from a given dredging site. Depending, for example, on the nature and location of toxic materials in the spoil and upon how these materials are chemically bound together, a choice must be made as to whether the dredged matter should be disposed of on land, in shallow water,[15] in open deeper waters (such as Long Island Sound), or in deep ocean.[16] At the point where a specific site must be selected, additional factors must be considered. Where disposal is in open water, for example, these factors include water currents in the area, its

8. The spoil from the New Haven channel exceeds standards for purity established in EPA guidelines promulgated in January, 1971. Plaintiff's Exhibit 1; *see,* Conley Affidavit for discussion of guidelines and transcript, Second Ocean Disposal Conference, Groton, Conn., February 24, 1972, Andreliunas Affidavit, Exhibit K.

9. *See* list of such studies attached to Hard Affidavit.

10. The first "Ocean Disposal Conference" was held at Woods Hole, Massachusetts on February 23, 1971. The second conference of the same name was held at Groton, Connecticut on February 24, 1972.

11. Conclusion 8, unpublished summary of conference, Miller Affidavit, Exhibit C.

12. Letters from Environmental Protection Agency Administrator Ruckelshaus to John J. Curry, Director, Connecticut

Water Resources Commission and Henry L. Diamond, Commissioner, New York Department of Environmental Conservation, dated November 29, 1971. Miller Affidavit, Exhibits A and B.

13. Conley Affidavit, Exhibit A.

14. *Compare* Gustafson, "Ecological Effects of Dredged Borrow Pits," World Dredging and Marine Construction, September, 1972, Nawlalk Affidavit, Exhibit A.

15. This suggestion is offered by two of fendants' own expert affidants in Andreliunas and Hard, "Dredging Disposal: Real or Imaginary Dilemma," Water Spectrum, Spring, 1972, Hard Affidavit, Exhibit A.

16. Another possibility is to use the spoil to construct dikes, *see* transcript, Second Ocean Disposal Conference, *supra* note 8, at 89; or to create new wetlands, *id.* at 33–34.

bottom topography and composition,[17] the present use of the area, etc., all of which can influence the impact the dumping will have. Finally, there are numerous techniques for accomplishing the dumping itself, such as diluting the spoil, burying toxic portions under purer ones, or adding agents to the spoil when necessary to increase its cohesion and reduce the possibility of dispersion from the dumping site.

Defendants' study of these impact-minimizing alternatives has not been extensive. While core samples of the harbor channel taken by defendant have established the presence of toxic matter in the material to be dredged, there appears to have been no examination, for example, to determine how this matter is chemically organized [18] and thus how great a risk it will pose if moved to another site. Nor apparently has any study been undertaken to see whether these toxic substances occur in discrete locations which might permit them to be buried under less polluted material at the dump site. In addition, while defendants seem to have given some thought to, and to have rejected, disposal on land or in deep ocean, other alternatives to open water disposal appear not to have been weighed to any appreciable degree.

Of even greater concern is that, prior to selection of the New Haven dump site, no study was made to assess the appropriateness of using this site to receive spoil from this dredging operation. The site has been used periodically since 1946 and apparently was chosen by defendants for this reason without prior consideration of the environmental impact of such a choice. Even were defendants to confine their choice of dump site to presently existing ones, nineteen such sites exist in Long Island Sound, any of which may well be better suited to receive some or all of the New Haven harbor spoil than the New Haven site.[19]

Under these circumstances, enjoining defendants from proceeding with the proposed dredging and dumping until alternatives may be fully considered is clearly proper. Whatever short-term economic loss is faced by shippers is outweighed by the long-term risks to the environment. The danger of environmental injury inherent in the project is substantial and a significant reduction of these dangers is sufficiently likely to require their careful consideration through the procedures of an impact statement.

Accordingly, the motion is granted to preliminarily enjoin the defendants, their agents and employees and those persons in active concert or participation with them from taking any steps to dredge the New Haven harbor until an environmental impact statement has been prepared according to the provisions of § 102(2)(C) of the National Environmental Policy Act. Unless the defendants notify the Court within twenty days of any issues of material fact which they wish to dispute, the temporary injunction will become permanent.

17. *See* transcript of Second Ocean Disposal Conference, *supra*, *passim*, especially at 5–19.

18. Heavy metals, for example, often can occur in forms which cannot escape into the water, as when they are found in rock. *Id.* at 14, 45–50; Andreliunas and Hard, *supra* note 15, at 19.

19. 33 C.F.R. § 205.10(c). Dumping *methods* which might reduce environmental damage also appear to have received slight attention.