**FRIENDS OF THE EARTH, INC., a New York Corporation, et al., Plaintiffs,**

v.

**Earl L. BUTZ, in his official capacity as Secretary of Agriculture, et al., Defendants.**

**No. CV–75–23–BLG.**

United States District Court, D. Montana, Billings Division.

Sept. 17, 1975.

William L. Madden, Jr., Bozeman, Mont., for plaintiffs.

Keith L. Burrowes, Asst. U. S. Atty., Billings, Mont., James M. Haughey and Robert E. Lee, Crowley, Kilbourne, Haughey, Hanson & Gallagher, Billings, Mont., and Robert T. Connery, R. Brooke Jackson, Holland & Hart, Denver, Colo., for defendants.

## MEMORANDUM AND ORDER

BATTIN, District Judge.

Presently pending is the motion of defendant Johns-Manville Sales Corporation (JMSC) for the entry of summary judgment in its favor and the dismissing of plaintiffs' complaint.

Since 1967, JMSC has been exploring for minerals of economic value within the Custer National Forest in an area known as the "Stillwater Complex." On October 25, 1975, JMSC requested written approval of the Forest Service of an exploratory mining operation. On November 19, 1974, relying upon an "Envi-

ronmental Analysis Report" (EAR), the Forest Service approved the operation and determined that an "Environmental Impact Statement (EIS) was not required for this stage of operations.

The plan, as described in the EAR contemplates the following: (1) The drilling of a 3000-foot exploration adit adjacent to the West Fork of the Stillwater River; (2) spot improvement of approximately 6.0 miles of the West Fork Stillwater Road; (3) construction of a bridge across the West Fork of the Stillwater River; (4) a temporary campsite for housing the crew near the adit; (5) approximately 300 feet of new road for access to the adit portal; (6) location of a compressor/laboratory building near the adit; and (7) storage of approximately 4000 cubic yards of rock extracted from the adit near the adit portal. (EAR, p. 2.)

The campsite, the 300 feet of new road to the adit portal, and the compressor/laboratory building have been completed. Adit drilling began in late December 1974.

On February 18, 1975, the plaintiffs filed with the Forest Service a Notice of Appeal of that department's approval of the JMSC exploratory operation. Plaintiffs contended that the Forest Service should not have approved the operation without first preparing a formal EIS. By letter dated February 21, 1975, Mr. Steve Yurich, Regional Forester, advised plaintiffs that their Notice of Appeal was not timely and therefore could not be accepted. Thus, the plaintiffs filed this action on March 27, 1975, in which they alleged a violation by defendants of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*

The plaintiffs' complaint centers around essentially three arguments:

(1) The Forest Service's approval of the operation was made without compliance with the National Environmental Protection Act's (NEPA) procedural requirements for agency consultation and public participation requirements.

(2) The Forest Service failed to prepare an adequate reviewable environmental record to support its determination not to prepare an EIS.

(3) An EIS should have been prepared.

## I. *PROCEDURAL REQUIREMENTS.*

Plaintiffs argue that the Forest Service had a duty to give public notice and solicit public input prior to making the threshold determination that an EIS was not required. In support thereof, plaintiffs cite Section 102 (42 U.S.C.A. § 4332).

On its face, Section 102 does not require any notice. It simply instructs federal agencies to identify and develop methods to assure that environmental amenities will be given consideration in any agency decision.

Even the Council on Environmental Quality guidelines provides no support for public notice before the threshold determination. 40 C.F.R. § 1500.6(e) provides that agency procedure should include an appropriate early notice system for informing the public of the decision to prepare a *draft environmental statement.*

Additionally, plaintiffs cite the case of *Hanly v. Kleindienst,* 471 F.2d 823 (2nd Cir. 1972) *("Hanly II"),* for the proposition that public notice and participation are required before the threshold determination is made. Such certainly is an accurate description of that case. However, as defendants point out, Judge Friendly dissented and observed that the majority's holding had no basis in NEPA and was essentially contrary to the holding of the same Court in *Hanly v. Mitchell,* 460 F.2d 640 (2nd Cir. 1972) *("Hanly I").* Thereafter, the Second Circuit in *Harlem Valley Transportation Association v. Stafford,* 500 F.2d 328 (2nd Cir. 1974), considered whether an Interstate Commerce Commission administrative law judge could make a threshold determination on whether EIS's were required in rail abandonment proceedings without even consulting the ICC's own

staff, much less obtaining outside input. The Court held that the administrative law judge should generally seek input and assistance from the staff of his agency instead of simply going ahead and making the threshold determination by himself. 500 F.2d 337.

The Court held that:

"The requirements of what the agency must consider in making the determination of whether an impact statement is necessary are governed by a rule of reason . . . ."

and observed that there may be cases in which it would not even be necessary for the administrative law judge to seek internal staff assistance before making the threshold determination. The Court did not overrule *Hanly II* but purportedly followed the rule of that case. The Court notes that subsequent to *Hanly II*, and before the *Harlem Valley* decision, 40 C.F.R. § 1500.6(e), which establishes that public notice is required before the preparation of a draft environmental statement, was added. Therefore, this Court considers *Harlem Valley* to be the better statement of the law.

Plaintiffs also assert that the public notice requirement arises under the Forest Service's own NEPA guidelines. 39 Fed.Reg. 38244, *et seq.* (Oct. 30, 1974). Section 84130 of the Forest Service guidelines provides:

"The consultation and review process normally will involve seven steps, as follows:

"1. Individual agency and public inputs and preliminary consultation leading to development of a draft environmental statement. Early public involvement and consultation with other agencies prior to development is important and should normally be an integral part of the process. . . . " 39 Fed. Reg. 38253.

Certainly the above regulation goes to initial procedures prior to the preparation of a draft EIS and not prior to the threshold determination. Even under Section 8413.1, entitled "Preliminary Consultation and Advice," consultation

with other appropriate agencies and the public should be during the environmental analysis stage and before the draft environmental statement is prepared.

Secondly, the plaintiffs argue that Forest Service procedures were defective in that the Forest Service failed to consult with "relevant Federal, state and local agencies or the professional services of universities and outside consultants . . . to help assure a systematic evaluation of reasonable alternative courses of action and their potential social, economic, and environmental consequences." C. E. Q. Guidelines, 40 CFR § 1500–8–(c).

The EAR reflects that the Forest Service consulted the Montana State Department of Lands with specific reference to JMSC's Plan of Operations and the preparation of the EAR, but that that agency declined to become involved because the proposed activities were considered to be exploratory (EAR, p. 16). In addition, on November 19, 1974, representatives of the Forest Service, the Montana Department of Fish and Game, the Montana Land Board, and JMSC met to discuss the proposed Plan of Operations and to review the EAR before Forest Service approval. Several recommendations made by the Department of Fish and Game after this meeting were incorporated in the EAR.

In *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275 (9th Cir. 1973), the Ninth Circuit analyzed Section 102(2)(B) of NEPA. Far from interpreting that section as requiring special notice prior to the threshold determination, the Court held:

"Neither § 102(2)(B) nor (C) can be read as a requirement that complete information concerning the environmental impact of a project must be obtained before the action may be taken. If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project would ever be initiated." 471 F.2d at 1280.

II. *DID THE FOREST SERVICE FAIL TO PREPARE AN ADEQUATE, REVIEWABLE ENVIRONMENTAL RECORD TO SUPPORT ITS DETERMINATION NOT TO PREPARE AN EIS?*

More particularly, the plaintiffs argue that the EAR is inadequate in three particulars:

1. It does not contain all of the required discussions of secondary consequences, of appropriate alternatives and mitigating measures, or of irretrievable commitments and all of the relevant factors pertinent to making a "negative determination;"

2. That the EAR makes assumptions for which there is no, or inadequate, discussion of substantiating facts (*e. g.,* the statement in the EAR that "should this operation prove feasible, the United States' depending on foreign sources for [platinum] will be decreased"); and

3. That the EAR formulates unwarranted conclusions for which there is not only lack of sufficient information, but which are also at variance with common knowledge (*e. g.,* "Noise pollution exists only if there are people in the area to hear the noise" (EAR, p. 5).

 It appears in *Hanly I,* 460 F.2d at 647–49, that a reviewable environmental record must support an agency threshold negative determination. However, as pointed out in *Sherr v. Volpe,* 466 F.2d 1027, 1032 (7 Cir. 1972), not every case will require that the agency must articulate in writing the reasons why no environmental statement was filed.

 In any event, the EAR is a sufficient reviewable environmental record of the Forest Service's threshold negative determination. The EAR identifies numerous environmental ramifications of the exploratory project, both adverse and beneficial. Each such environmental effect is discussed both in terms of the amount of damage or benefit reasonable foreseeable, and reclamation activity required to remove surface disturbances that may occur during the project. The Ninth Circuit has held that the adequacy of an EIS should be determined through the rule of reason, and it is not fatally defective because it speaks in conclusory terms or lacks detail. The Court stated:

"A reasonably thorough discussion of the significant aspects of the probable environmental consequences is all that is required by an EIS." *Trout Unlimited v. Morton,* .509 F.2d 1276 (9th Cir. 1974).

III. *IS THE FOREST SERVICE'S APPROVAL OF THE EXPLORATORY MINING OPERATION A "MAJOR" FEDERAL ACTION REQUIRING THE PREPARATION OF AN ENVIRONMENTAL IMPACT STATEMENT?*

Section 102(2)(C) of NEPA requires the preparation of an EIS on "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C).

Indeed, this Court faces "a difficult problem in determining the meaning of the vague and amorphous term 'significantly' as used in § 102(2)(C) . . . ." *Hanly II,* 471 F.2d 823, 831 (2 Cir. 1972).

Plaintiffs argue that the driving of a mining tunnel, the building of access roads, the construction of a bridge, the erection of steel buildings, and the installation of a septic system will have a significant impact on water quality and the scenic value of the area. In short, plaintiffs contend that the JMSC's activities constitute "major" action in terms of "irretrievable commitments" precluding the consideration of alternatives. Plaintiffs assert that an EIS must be prepared early enough in the decision-making process so that adverse environmental effects can be anticipated and minimized before they come to pass. *Lathan v. Volpe,* 455 F.2d 1111 (9th Cir. 1971).

■ The defendants argue that an EIS is not yet required, since the Forest Service's approval merely went to defendant JMSC's plan of proposed prospecting operations. Defendants point to the 1872 mining law (30 U.S.C. §§ 22 et seq.), and the Organic Act of June 4, 1897 (16 U.S.C. § 748), for the proposition that defendant JMSC has a statutory right to go upon national forest lands for the purposes of mineral exploration, development and production. Regardless of what right JMSC may have, the defendants still must comply with NEPA.

Under these facts, case law provides no clear guidance, although Forest Service NEPA guidelines are of some value. The Guidelines include three groups of examples: Forest Service actions which always require an EIS (§ 8411.41); never require an EIS (§ 8411.42); and sometimes require an EIS (§ 8411.43). 39 Fed.Reg. 38249–50. Within the latter group the guidelines establish two subcategories: the second category is actions "in which the need for environmental statements should be considered." Included within this latter subcategory are "mining permits and certain prospecting permits." Thus, the defendants' operation does not meet with a black and white test for determining whether an EIS is required. Under this second subcategory, the responsible official must use "reasonable judgment."

■ In the absence of specific guidance, the threshold determination must be made, and reviewed, according to the facts of this individual case.

JMSC has been actively exploring since 1967 for minerals of economic value in the Stillwater complex, and started staking mining claims in 1968, with expiration drilling commencing in 1969. During the winter of 1970–71, JMSC began working with the Forest Service on various aspects of this overall exploratory project. Meetings before the Forest Service and JMSC led to a set of guidelines on mineral exploration in the Custer and Gallatin National Forests, issued in April 1971. During the winter of 1970–71, the Forest Service, the United States Geological Survey, the Montana Department of Fish and Game, and the Montana Department of Health, in cooperation with JMSC and other mining companies, prepared a draft interagency proposal regarding water quality monitoring in the Stillwater complex. Further, in July 1971, JMSC, the Forest Service, and the Montana Department of Fish and Game jointly adopted reclamation guidelines with respect to mining exploration in the complex.

Then, on August 28, 1974, the Forest Service issued regulations effective September 1, 1974, establishing an entirely new system for control by the Forest Service of prospecting and mining activities on national forest lands. 39 Fed. Reg. 31317, et seq. (Aug. 28, 1974). The new regulations require persons desiring to conduct exploratory activities to submit to the Forest Service a "Notice of Intention to Operate." 39 Fed.Reg. 31317, § 252.4(a). If the District Ranger determines from the notice of intent that the proposed operation will likely cause significant disturbance of the surface resources, the operator is required to submit a proposed "plan of operations." *Ibid.* The Forest Service is required to analyze each proposed plan of operations and determine whether an EIS is required. 39 Fed.Reg. 31318, § 252.4(f).

Under the new regulations, the Forest Service examined JMSC's proposed prospecting activities to determine whether they would have adverse environmental consequences and approved a plan of operations.

At this point, the Court will examine the present and proposed activities of JMSC.

1. *Roads.* The project calls for "spot stabilization" of approximately six miles of existing road and the construction of approximately 300 feet of new road for access to the adit portal. The road on the West Fork of the Stillwater has been in existence since 1942, having been constructed to provide access to chrome mining claims. In addition to the stabilization of the road, there will be the installation of additional culverts.

2. *Bridge.* Under the project, JMSC is installing a bridge across the West Fork of the Stillwater River. The bridge is located at the site of the previous bridge which was installed in 1953 and later removed by the direction of the Forest Service. The bridge will be closed to public vehicle traffic at least for the duration of the exploratory project. The environmental analysis report indicates that there will be disturbance of the stream bed during construction, but the stream bed will be totally reclaimed.

3. *Camp.* The buildings and trailers of the defendant, which are of an earth color, are located on approximately one-quarter of an existing camp which will continue to be available for public use.

4. *Compressor building.* A 1500 square-foot building which houses a compressor and other facilities has been installed in the existing clearing near the adit portal. The building will be removed upon completion of the project.

5. *Water quality.* A water quality monitoring program has been in effect in this area since 1971. Additional monitoring will be undertaken commencing January 1, 1975. The environmental analysis report expressly provides that "if tests indicate water quality has been altered, the operation will be stopped until the source is found and corrected."

6. *Waste rock.* The project involves removal of approximately 3000 yards of waste rock, which will be deposited on a talus slope with approximately the same type of rock. A portion of this waste rock may be used in connection with the improvement of 300 feet of new road.

7. *Elk.* There will be some disturbance of elk and deer wintering along the road, but the Forest Service found that since traffic will be light and intermittent, the impact will not be a major disturbance of big game use patterns.

8. *Public access.* There is some concern that public access would be improved, thus increasing the use of that area. It appears that the net effect of the exploratory project, when reclaimed, which JMSC will do, will be the minor improvement of an existing road, the construction of only 300 feet of new road, and installation of a bridge.

It appears that the present or proposed activities and the necessary reclamation will only result in minor disturbances to the West Fork. JMSC's operations realistically involve only a small project which will not significantly affect the quality of human environment. But, as JMSC indicates and as the Court completely agrees, if JMSC later desires to proceed with the mining operation, an environmental impact statement will be required before any mining activity commences.

As this Court stated in *Redding v. Morton,* CV–74–12–BLG:

"The NEPA is designed to produce better-informed decisions oriented toward environmental protection, not to prevent such decisions. Prospecting provides the information necessary to evaluate the proposed leases without cost to the Indians or the public; to obtain such information before issuing permits would require massive, unnecessary federal expenditure."[1]

### CONCLUSION

Upon the facts and briefs, the Court reaches the following conclusions:

1. That the Forest Service's approval of the operation was made in conformance with the NEPA requirements concerning public participation and agency consultation;

2. That the EAR is an adequate reviewable environmental record to support its determination not to prepare an EIS; and

3. That the approval of the operation was not a major federal action significantly affecting the human environment.

Therefore, it is ordered that summary judgment be entered for the defendants.

[1]. This decision was appealed to the Ninth Circuit, No. 74–1984 (June 19, 1975), which noted this Court's decision regarding the prospecting permits, but the Ninth Circuit addressed itself only to the approval of leases as major federal action and not to the permits.