SAVE THE COURTHOUSE COMMIT-TEE et al., Plaintiffs,

v.

James LYNN, Individually and as Secretary, United States Department of Housing and Urban Development, et al., Defendants.

No. 74 Civ. 5646.

United States District Court,
S. D. New York.

March 6, 1975.

Atty., Jane D. Lollis, Atty. Advisor, Regional Counsel, Region II, HUD, New York City, for Officials of the Housing and Urban Development.

Raymond P. O'Keefe, Robert M. Redis, McCarthy, Fingar, Donovan & Glatthaar, White Plains, N. Y., for White Plains Urban Renewal Agency.

Morton H. Zucker, Acting Corp. Counsel, Anthony J. Grant, Senior Asst. Corp. Counsel, White Plains, N. Y., for City of White Plains.

PIERCE, District Judge.

## OPINION

Claiming violations of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470 et seq., the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., Executive Order No. 11,-593, 36 Fed.Reg. 8921 (May 15, 1971) and various regulations, the plaintiffs herein seek a preliminary injunction to prevent the proposed demolition of a six-building complex known as the old Westchester County Courthouse in White Plains, New York (the Courthouse). The planned demolition is part of an on-going urban renewal project implementation of which began in 1965 through the combined efforts of the United States Department of Housing and Urban Development (HUD) and the White Plains Urban Renewal Agency (the Agency). The complaint is essentially premised on the allegations that the defendants have chosen to disregard statutory and procedural safeguards designed to protect structures of recognized historical, architectural and esthetic significance. The Courthouse is said to fall within this category.

Plaintiff "Save the Courthouse Committee" (the Committee) is an unincorporated citizens' association established in February 1974 for the avowed purpose of preserving the Courthouse as an historical and architectural landmark. It is composed of about 100 members—75 to 80 of which are allegedly residents of White Plains. The individual plaintiffs are also said to be White Plains resi-

Stephen L. Kass, Barry S. Neuman, Berle, Butzel & Kass, New York City, for plaintiffs.

Paul J. Curran, U. S. Atty., New York City, by Walter S. Mack, Jr., Asst. U. S.

dents. In addition, plaintiffs Holden and Kanas claim to own property and a business establishment respectively in the vicinity adjacent to the Courthouse site. Plaintiff Thiell claims a reversionary interest in the Courthouse site itself.

The federal defendants are officials of the Department of Housing and Urban Development and will be hereinafter collectively referred to as HUD. The defendant White Plains Urban Renewal Agency is the local agency within the City of White Plains which, under applicable law, is charged with carrying out the White Plains Urban Renewal Plan. The City of White Plains was given leave to intervene as a defendant.

The application for preliminary relief was brought by order to show cause dated December 23, 1974. Shortly thereafter defendants HUD and the Agency filed motions to dismiss and on December 31, 1974 the Court issued a Temporary Restraining Order enjoining the demolition of the Courthouse. A hearing was held on this matter at the conclusion of which the TRO was extended with the consent of the defendants until the Court's determination of the controversy.

## BACKGROUND

The general factual setting of this litigation is largely not in dispute. It seems that beginning in 1954 the County of Westchester and the City of White Plains began studies regarding the feasibility of renewal of the downtown area of White Plains. In 1958 the Common Council of the City determined that the area was appropriate for an urban renewal project. The project as then envisioned was to include the clearance of the old Courthouse and the construction of a new facility at a different location.[1]

After a substantial period of preparatory work the White Plains Urban Renewal Agency—which had been created by the New York State Legislature in 1964—and the United States Urban Renewal Administration, HUD's predecessor, entered into a Loan and Capital Grant Contract on July 14, 1965 [2] so that the approved urban renewal plan could be effectuated. To achieve this goal the contract provided for loans of up to $39,-353,211 and a capital grant of up to $27,-507,331 from the federal government to the Agency and also for an increase to the capital grant for relocation payments to residents of the project in an amount not to exceed $833,200.00.

The Urban Renewal Project as later revised contemplated the acquisition of 493 parcels of land comprising 130 acres and apparently envisioned the complete reconstruction of the central section of White Plains. Further, the plan as originally conceived and again as subsequently modified provided for the demolition of the old Courthouse and for parking or commercial use of the Courthouse site in the future. This site is apparently viewed by White Plains officials as a key link in the overall Urban Renewal Project and the demolition of the Courthouse is deemed to be integrally related to the segments of the urban renewal project.

Between 1965 and 1973 several amendments to the Contract were executed by the Agency and HUD. In general, these amendatories increased the ceiling amounts for the loans and grants and the relocation payments. In addition amendments approved by HUD in 1972 revised the plan in several respects, e. g., the number of parcels of land to be acquired and developed by the Agency was increased from 486 to 493 and provision was made for the construction of a second level pedestrian walkway system.

---

1. The construction of the new Courthouse facility was completed in 1973.

2. The approval of the Urban Renewal Plan was in fact granted in two stages. Part I of the Loan and Grant Contract was approved on February 12, 1964 and Part II was approved on April 14, 1965. It appears that these approvals were consolidated in the July 14, 1965 Loan and Grant Contract. (Def. HUD's Exh. C.)

Certain changes were also made in the land use designation of several parcels in the project area (including the parcel upon which the Courthouse is located) from "public parking use" to "central commercial use". In connection with these changes, in 1972 the Agency prepared a Draft Environmental Worksheet at HUD's request on the basis of which HUD later determined that the amendments were environmentally acceptable and would not require the preparation of a more detailed environmental review.

The last amendatory to the Contract was executed on December 18, 1974 and increased the authorized project loans from $75,172,297 to $76,374,997 and the project's capital grant from $54,322,297 to $55,524,997.

It should be noted that none of the amendments to the Contract has ever deviated from the original concept that the old Courthouse complex was to be demolished.

In August 1972, Federated Department Stores, Inc. formally proposed to the Agency that it be designated as the sponsor to develop a department store on the site of the old Courthouse and adjacent property. Since then, Federated has been designated as an eligible sponsor but no binding contract has been entered into between Federated and the Agency. However, it has been claimed without opposition that Federated stands ready to proceed with the retail development of the site once the Agency clears the site. With respect to this the parties have stipulated that no data has been furnished HUD regarding the proposed development of the Courthouse site and that any such development is subject to HUD approval.

On December 7, 1973 the Agency purchased the Courthouse from the County of Westchester for 3.5 million dollars. Four days earlier the U. S. Department of the Interior had published its finding that the Courthouse appeared to meet the criteria for listing in the National Register of Historic Places. 38 Fed.Reg. 33429 (Dec. 4, 1973). A number of communications were sent to HUD during late 1973 and 1974 by the Department of the Interior and the Advisory Council on Historic Preservation[3] expressing concern about the proposed demolition of the Courthouse. Also during the latter part of 1973, the New York State Division for Historic Preservation notified Westchester County officials that the Courthouse had been suggested as eligible for inclusion in the National Register. A copy of this communication was forwarded to the Agency and on December 27, 1973 an official of the State Division of Historic Preservation discussed the matter with the Executive Director of the Agency.

As noted before, the Save the Courthouse Committee was formed in early 1974 in an effort to prevent the planned demolition. Shortly thereafter a series of communications ensued between the Agency and the Committee concerning the Courthouse. After making some preliminary investigation into the alleged historical and architectural significance of the Courthouse the Agency decided to proceed with the demolition. On December 13, 1974 proposed bids for the demolition work were received by the Agency and on December 18, 1974 HUD approved the contractor selected by the Agency. The next day the Agency announced its intention to proceed as rapidly as possible with the demolition plan. On December 23, 1974 plaintiffs began this action.

 Other relevant developments occurred after this action was commenced. On January 9, 1975, HUD, responding to the various communications it had received from the Advisory Council, expressed its opinion that as far as the proposed demolition of the Courthouse was concerned it was "not legally obligated to change the terms of the

3. The Advisory Council on Historic Preservation was established by § 201 of NHPA. (16 U.S.C. § 470i.) The Council, composed of 20 members, has the primary responsibility for encouraging efforts on all levels of government for the preservation of cultural resources. (16 U.S.C. § 470j.)

Loan and Grant Contract as approved." However, HUD also indicated that a Special Environmental Clearance [4] would be undertaken. This clearance was completed on January 16, 1975. Two days earlier, the New York State Division for Historic Preservation had formally nominated [5] the Courthouse to be included in the National Register of Historic Places and on January 17, 1975 the Courthouse was listed in that Register by the Department of the Interior.

## DISCUSSION

Defendants raise three threshold issues: they have challenged the jurisdiction of this Court to decide the issues raised herein; they have questioned the legal standing of the plaintiffs; and they have asserted that the plaintiffs are barred by the doctrine of laches from litigating the issues presented.

### Jurisdiction

Plaintiffs contend that the Court has subject matter jurisdiction under a number [6] of statutes including but not limited to the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., and the federal question jurisdiction statute, 28 U.S.C. § 1331(a).

This Court begins with the general proposition that federal agency action is presumptively reviewable by a federal district court under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Thus in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681, 687 (1967), the Supreme Court noted that that Act "provides specifically not only for review of '[a]gency action made reviewable by statute' but also for review of 'final agency action for which there is no other adequate remedy in a court.' " The Court there went on to state that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Id.* at 141, 87 S.Ct. at 1511. In *Citizens Committee for the Hudson Valley v. Volpe,* 425 F.2d 97, 101 (2d Cir. 1970), *cert. denied,* 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970), the Court explicitly stated that there is a "presumption of reviewability embodied in the Administrative Procedure Act where there [is] no evidence of a congressional intent to prohibit review." And while it is true that neither the Supreme Court nor the Second Circuit Court of Appeals has squarely held that the APA furnishes an independent basis for federal jurisdic-

**4.** HUD has adopted essentially a three-tiered method of environmental review consisting of (1) Normal Environmental Clearance; (2) Special Environmental Clearance, and (3) Environmental Impact Statement Clearance. *HUD Handbook 1390.1,* 38 Fed.Reg. 19182 (July 18, 1973). The Normal Environmental Clearance consists of a "brief evaluation of environmental impact. Special Clearance requires an environmental evaluation of greater detail and depth. Finally, an Environmental Impact Statement is the complete and fully comprehensive environmental evaluation, including formal review by other Federal, State and local agencies" as required by NEPA. *HUD Handbook 1390.1, supra,* § 5a. Some proposed actions must be processed directly through a Special Clearance, bypassing the Normal Clearance review. For example, an undertaking "which has an effect on property listed on, or nominated to, the National Register of Historic Places" must receive Special Environmental Clearance. *Id.* § 5(a)(6).

**5.** The National Park Service, Department of the Interior, has established a system for nominating cultural properties for listing on the National Register. See 40 Fed.Reg. 5242 (Feb. 4, 1975). Nominations "are prepared by state officials in accordance with policies set at the federal level." These "nominations are reviewed by the keeper of the National Register, an official of the National Park Service, to ensure that the criteria have been followed and, if so, the nominations are approved." J. M. Fowler, *Protection of the Cultural Environment in Federal Law,* printed in *Federal Environmental Law* 1466, 1487 (Env.Law Institute 1974).

**6.** In addition to the statutory bases discussed in the text the complaint alleges that the Court has jurisdiction pursuant to the provisions of 28 U.S.C. § 1361 (mandamus) and 28 U.S.C. §§ 2201–02. (Declaratory Judgment.) In view of this Court's finding that it has jurisdiction under other statutes, the merits of these allegations need not be discussed.

tion, the rationale of decisions construing this statute certainly lead in this direction. *Lyons v. Weinberger,* 376 F.Supp. 248, 256 (S.D.N.Y.1974). See also *Davis v. Romney,* 355 F.Supp. 29, 40–41 (E.D.Penn.1973).

There has been no claim that the statutes under which the plaintiffs purport to bring their alleged claims affirmatively preclude judicial review. In fact, a number of courts have either explicitly or implicitly found under circumstances similar to the ones presented here that a federal district court has the power to decide disputes relating to agency action or inaction with respect to the requirements of the National Environmental Policy Act (NEPA) or the National Historic Preservation Act (NHPA). See, e. g., *Jones v. Lynn,* 477 F.2d 885 (1st Cir. 1973); *Warm Springs Dam Task Force v. Gribble,* 378 F.Supp. 240 (N.D.Cal. 1974); *James v. Lynn,* 374 F.Supp. 900 (D.Colo.1974); *Ely v. Velde,* 321 F.Supp. 1088 (E.D.Va.1971), *rev'd on other grounds,* 451 F.2d 1130 (4th Cir. 1971).

■ The Court therefore concludes that it has subject matter jurisdiction to rule on the questions raised herein.

■ Moreover, the Court also has jurisdiction under the provisions of 28 U.S.C. § 1331(a) (federal question). It is incontrovertible that the issues presented raise federal questions. The concern here is with the applicability of federal statutes, an executive order and regulations issued by federal entities. With respect to the amount in controversy, generally, this is measured from the standpoint of the plaintiff or by the value of the interest he seeks to protect. *Kheel v. Port of New York Authority,* 457 F.2d 46, 49 (2d Cir. 1972), *cert. denied,* 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972). The plaintiffs herein are concerned with the preservation of a structure of purported historic and architectural significance. Obviously it is difficult—if not well-nigh impossible—to assign a precise value to such an interest. In *Illinois v. City of Milwaukee,* 406 U.S. 91, 98, 92 S.Ct. 1385, 1390, 31 L.Ed.2d 712, 720 (1972), the Supreme

Court in dealing with a similarly difficult to measure interest—the preservation of the purity of interstate waters—declared: "The considerable interests involved in the purity of interstate waters would seem to put beyond question the jurisdictional amount provided in § 1331(a)." Adopting a similar approach one can fairly say that the "considerable interests" involved in the preservation of cultural resources "would seem to put beyond question the jurisdictional amount provided in § 1331(a)."

Also, if the amount in controversy is calculated from a different perspective it is clear that this amount exceeds $10,000. Thus, for example, should the need arise to reassess the proposed demolition of the Courthouse this may entail or cause the expenditures of funds far in excess of that amount. See *Citizens for Clean Air, Inc. v. Corps of Engineers, U. S. Army,* 349 F.Supp. 696, 703–04 (S.D.N.Y. 1972). See also *River v. Richmond Metropolitan Authority,* 359 F.Supp. 611, 622–23 (E.D.Va.1973), *aff'd,* 481 F.2d 1280 (4th Cir. 1973).

The Court finds that it has jurisdiction under both the Administrative Procedure Act and 28 U.S.C. § 1331(a).

*Standing*

■■ The defendants challenge plaintiffs' standing to bring this action asserting that they have not alleged any ownership, economic or special interest in the Courthouse. Recent Supreme Court decisions have established a twofold test for determining whether, in cases of this nature, plaintiffs have standing to sue: first, the person bringing the suit must assert that he has suffered or will suffer "injury in fact" as a result of the alleged illegal federal action; second, the injury must be to an interest arguably within the zone of interests to be protected or regulated by the statutes the Agency is claimed to have violated. *Association of Data Processing Service Org. v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). No longer must the injury be to an economic interest. Injury to esthetic and environmental inter-

ests has been recognized as laying a sufficient foundation for standing so long as the party seeking review is himself among the injured. *Sierra Club v. Morton*, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

The plaintiffs assert standing on the ground that they are adversely affected and aggrieved by the alleged illegal action of the federal agency. Under section 702 of the Administrative Procedure Act (5 U.S.C. § 702): "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." In *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), SCRAP contended that it had standing since it had been "adversely affected or aggrieved" within the meaning of the APA. In support of its position it alleged that (1) its members used the natural resources of the Washington area, and (2) the federal action questioned would cause adverse environmental effects to such resources thereby harming its members in the enjoyment and use of the natural resources. The Court held that such allegations if proven would support a finding of injury in fact to the plaintiff.

■ The Court finds that the allegations of the complaint and the testimony at the hearing similarly support a finding of "injury in fact". The complaint alleges that the proposed action will deprive plaintiffs of the esthetic benefit they presently derive from the Courthouse. While it is true that such a benefit hardly can be quantified, this is not to say that it is thereby so insufficient that loss of it will not support a finding of standing. Injury due to loss of benefits that might be derived from natural resources such as camping, hiking, fishing, sightseeing and the like is similarly of an intangible character and yet potential injury to such interests was found in *SCRAP* to be enough to support standing. The fact that we are concerned here with esthetic enjoyment of a cultural resource with alleged historical and architectural value rather than a natural resource is not a significant distinction since injury to such interests can well be said to fall into the same category.

■ In addition to an injury in fact the plaintiffs must also show that they themselves have been injured. Where esthetic interests are presented it is somewhat difficult to ascertain whether the parties seeking review are or may in fact be injured by the proposed action. A mere declaration of harm to such an interest may be sufficient under some circumstances to demonstrate that plaintiffs fall within the group of persons whose interest may be injured. See *SCRAP, supra.* However, other factors, such as residence and prior usage and concern with respect to the cultural resource, may serve to buttress such a finding. See *San Francisco Tomorrow v. Romney*, 472 F.2d 1021 (1973); *Ely v. Velde*, 321 F.Supp. 1088 (E.D.Va.1971), *rev'd on other grounds*, 451 F.2d 1130 (4th Cir. 1971).

Here the Save the Courthouse Committee is composed of about 100 members 80% of whom are said to be residents of White Plains. Two of the individual plaintiffs own property in the vicinity of the Courthouse and, indeed, one of the individual plaintiffs claims a reversionary interest in the Courthouse site. Further, another of the individual plaintiffs, a resident of White Plains, practiced law in the old Courthouse and presumably he thereby became acquainted with the purported esthetic values of the Courthouse.

In this Court's judgment both the Save the Courthouse Committee and the individual plaintiffs have made a sufficient showing to support a finding that they in fact will be injured by the proposed demolition and the Court so finds.

The second element that must be presented to achieve standing concerns the question "whether the interest sought to be protected by the complainant is arguably within the zone of interest to be protected or regulated by the

statute or constitutional guarantee in question." *Data Processing Service, supra*, 397 U.S. at 153, 90 S.Ct. at 830. There can be no question that the interest sought to be protected here—the preservation of the Courthouse—is squarely within the zone of interest sought to be protected by the statutes invoked, NEPA and NHPA.

The Court therefore concludes that the plaintiffs have alleged and shown a particularized and identifiable harm to an interest protected by statute which falls within "[the] new categories of judicially cognizable injury" found sufficient to invoke judicial power. *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678, 42 U.S.L.W. 5076, 5080 (June 25, 1974).

*Laches*

A further threshold issue raised by the defendants is that of laches. It is argued that in light of the fact that the demolition of the Courthouse as part of an urban renewal project was first contemplated in 1954 and that the actual plan to clear the Courthouse site was approved in the 1965 Loan and Grant Contract, plaintiffs may not now at this late stage of the proceedings challenge the proposed demolition. In addition, HUD asserts that the Committee made no efforts to contact it with respect to its concern for the Courthouse until November 1974.

The Second Circuit Court of Appeals has recently indicated that in ruling on the question of laches in the environmental area "the primary question is not how much earlier plaintiffs should have sued, but whether injunctive relief pending compliance would still serve the public interest and the purposes" of the statute invoked. *Steubing v. Brinegar*, 511 F.2d 489 at 495 (2d Cir. 1975). Viewed by this standard it can hardly be said that this action is barred by laches. The Courthouse still stands and it cannot be said that it is no longer possible to alter the demolition plan should that be later required. Thus the public interest in preserving structures of historical and architectural significance, if such is found to be the case here, may still be safeguarded. In addition, the purposes of the statutes in question—the preservation of the cultural environment—may still be fulfilled.

Moreover, the Court finds that the action herein would not be barred under the usual laches standard. Under this test to prevail on the issue of laches defendants have the burden of establishing not only that plaintiffs' delay in bringing suit was unreasonable or inexcusable but also that the delay has been prejudicial to them. *Environmental Defense Fund v. TVA*, 468 F.2d 1164, 1182 (6th Cir. 1972); *Iowa Student Public Interest Research Group v. Callaway*, 379 F.Supp. 714, 719 (S.D.Iowa 1974). Also this Court is cognizant of the general reluctance to dismiss suits of this nature on the ground of delay in commencing suit. See cases cited in *Environmental Defense Fund, supra*, at 1183. In fact, generally, the defense of laches will not lie to bar suits seeking the protection of environmental concerns. See *Steubing v. Brinegar, supra; City of New York v. United States*, 337 F.Supp. 150, 160 (E.D. N.Y.1972) (Friendly, C. J.).

Mindful of these principles the Court finds that the delay in bringing the suit here was neither unreasonable nor inexcusable and that this suit is not barred by laches. The Court declines to adopt as the beginning point for measuring laches either 1954 when general discussions with regard to razing the Courthouse were first begun or 1965 when the Loan and Grant Contract was executed. To do so would be unreasonable: the statutes under which plaintiffs are suing had not even been enacted at that time; further, such a ruling would mean that, once a long-term urban renewal plan was approved by HUD, plaintiffs would best be advised to register their protests by means of a lawsuit immediately or risk the consequence of later being barred from suit by the doctrine of laches. It is common knowledge that proposed projects which are part of an urban renewal plan take considerable time

for implementation and that such projects are subject to modification and revision as the need arises.

 This Court finds that under the circumstances of this case laches should begin to run from the time it became reasonably clear to the plaintiffs that other efforts which might be undertaken—such as conferring with the agencies involved or presenting their case to local officials—would be fruitless.

In this case the Committee considered legal steps to be its final and least desirable alternative. It therefore sought first to persuade the Urban Renewal Agency to alter its plans for demolition. The Agency, in turn, at no time made it clear to the Committee that under no circumstances would such attempts be successful. Rather it engaged with the Committee in discussions concerning the merits of the claim that the Courthouse had historical and architectural significance. Indeed as late as November 1974 the Agency sought from the Committee detailed plans with respect to possible alternative uses for the Courthouse. Given this it was not unreasonable for the Committee to conclude that it could refrain from legal action. It was not until the Agency announced that it had accepted a bid for the demolition work and intended to proceed forthwith with the clearance of the site that it became clear that the Agency would indeed proceed with the demolition and that the Committee's efforts to persuade the Agency to do otherwise had proven unavailing. Under these circumstances the Court finds that the Committee's delay in commencing suit was not unreasonable or inexcusable. The defense of laches must therefore fall. Finally, with respect to HUD's contention that plaintiffs failed to contact it until November 1974, little need be said except to note that in December 1973 HUD had been alerted to the possible historical and architectural significance of the Courthouse by the Department of the Interior. Therefore, it is difficult to see how the

Committee's similar contention in November of 1974 may have come as a total surprise to HUD.

*The Standard*

In order to succeed on their motion for preliminary injunction plaintiffs must establish " 'either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.' " *Gresham v. Chambers,* 501 F.2d 687, 691 (2d Cir. 1974), quoting *Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973).

Thus, the issue here is not, as HUD asserts, whether it must now inform the Urban Renewal Agency that "the demolition of the Courthouse is no longer an eligible project cost . . . despite the terms of the [1965] Capital and Grant Contract" but rather, the initial issue is whether the plaintiffs have shown either "probable success on the merits . . . " or have raised "sufficiently serious questions going to the merits . . . ." More precisely, the initial issue concerns the alleged failure to comply with federal statutes, administrative regulations and an executive order. The issue posed by HUD is one that may or may not have to be eventually determined but as this Court sees it it has no need for present resolution.

*Applicability of NHPA (16 U.S.C. § 470 et seq.)*

 The National Historic Preservation Act, enacted on October 15, 1966, has as its prime overall goal the preservation of cultural resources. 16 U.S.C. § 470. Dissatisfaction had been voiced that legislation then[7] in force had proved to be inadequate in its protection of these resources other than those earmarked as "nationally significant." Thus, the House Report notes that other properties "worthy of protection because of their historical, architectural, or cul-

---

7. See, e. g., The Antiquities Act of 1906, 16 U.S.C. §§ 431–33; The Historic Sites Act of 1935, 16 U.S.C. §§ 461–467.

tural significance at the community, State or regional level [had] little protection given to them against the force of the wrecking ball." H.R.Rep.No.1916, 89th Cong., 2d Sess. (1966), U.S.Code Cong. & Admin.News 1966, pp. 3307, 3309. To help furnish this protection a National Register was established to include, inter alia, recognized historically and architecturally significant buildings and structures. 16 U.S.C. § 470a(a)(1). It was felt that in this fashion heads of federal agencies would be put on notice that they could not extend approval to federal or federally sponsored projects, such as urban renewal plans, if such projects would have an effect on listed properties unless the federal agencies complied with a certain procedure. *Hearings on S. 3035 and S. 3098 Before the Subcomm. on Parks and Recreation of the Senate Comm. on Interior and Insular Affairs,* 89th Cong., 2d Sess., at 26 (1966). This procedure would entail referring the matter for comment to the Advisory Council on Historic Preservation also established by NHPA. 16 U.S.C. § 470i.

This was the genesis and purpose of section 106 of NHPA. (16 U.S.C. § 470f).

That section provides, in part, as follows: "The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State . . . shall, prior to the approval of the expenditure of any Federal funds on the undertaking . . . , take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking."

▬ The words of this section are clear that the property which is affected by the undertaking must be included in the National Register at the time that the approval of the expenditure of Federal funds is being considered. See, e. g., *South Hill Neighborhood Ass'n v. Romney,* 421 F.2d 454 (6th Cir. 1969), cert. denied, 397 U.S. 1025, 90 S.Ct. 1261, 25 L.Ed.2d 534 (1970); *Kent County Council for Historic Preservation v. Romney,* 304 F.Supp. 885 (W.D.Mich. 1969). The Courthouse was not listed in the National Register until January 16, 1975 and therefore HUD had no responsibilities under § 106 with respect to the Courthouse prior to that time. The issue therefore is whether the registration of the Courthouse at this time will serve to require HUD to submit the proposed demolition to the Advisory Council for comment pursuant to section 106. This Court thinks not.

According to the statute such a procedure is to be followed "prior to the approval of the expenditure of any Federal funds on the undertaking." We are concerned here with a conventional urban renewal plan adopted and approved pursuant to the provisions of Title I of the Housing Act of 1949. (42 U.S.C. § 1441 et seq.) The original Loan and Grant Contract was executed almost 10 years ago on July 15, 1965. This agreement constituted the overall approval of federal funds for the project. This is not to say that once the Contract was signed the need for further approvals was foreclosed. Indeed, in a long-term urban renewal project, revisions of the plan and increases in the amounts of the committed federal funds are often needed and such revisions or increases require further HUD approval, witness the number of amendatories to the White Plains Urban Renewal Plan approved by HUD subsequent to the execution of the Loan and Grant Contract in 1965. However, none of those approvals took place at a time when the Courthouse was listed in the National Register nor did they concern a change with respect to the proposed disposition of the Courthouse thereby possibly necessitating compliance with § 106.

Now that the Courthouse has been so listed, the urban renewal project is reported to be in an advanced stage of implementation. Thus, it has been contended without dispute that of the 493 parcels which were to be acquired under the plan, all 493 parcels have been acquired; of the total 591 structures to be demolished, 580 structures have been contracted to be demolished and 577 have been actually demolished; virtually all site improvement work and street utilities are completed and in place; of 130 acres of land in the project, only 28 acres are uncommitted for development. (Defendant Urban Renewal Agency Exhibits E & F.) Thus we are presented with a project which is well under way to completion. May it be said that with respect to such a project there is yet further "approval of federal expenditures" required as would trigger the requirements of § 106? The Court believes not. At this point of the project development the overall federal financial commitment has already been made. HUD may not unilaterally choose to reassess its overall approval of the expenditures of federal funds for the urban renewal project. Consequently, in this Court's view, it is highly unlikely under the circumstances presented here that HUD need comply with § 106 of NHPA.

However, this conclusion does not end the need for further analysis since there are still other directives which impose additional responsibilities on federal agencies with respect to cultural resources.

*Executive Order No. 11,593*

On May 15, 1971, in an effort to implement the goals and policies of NHPA, the President promulgated Executive Order # 11,593. (36 Fed.Reg. 8921.) This order directs federal agencies to take certain steps in order "[to] provide leadership in preserving, restoring and maintaining the historic and cultural environment of the Nation." Section 1. Section 1(3) of the Order provides that agencies of the executive branch are "in consultation with the Advisory Council on Historic Preservation (16 U.S.C. 470i) [to] institute procedures to assure that Federal plans and programs contribute to the preservation and enhancement of non-federally owned sites, structures and objects of historical, architectural or archaeological significance." Section 2 of the Order directs the heads of federal agencies to adopt certain measures to ensure that the federal government's broad policy of protecting and enhancing the cultural environment is carried out. Thus, by no later than July 1, 1973, federal agencies were to catalogue and nominate to the Secretary of the Interior those properties "under their jurisdiction or control that appear[ed] to qualify for listing on the National Register of Historic Places." Section 2(a). As of May 15, 1971, therefore, HUD had an affirmative duty to evaluate all properties "within its jurisdiction or control" in order to comply with section 2(a) of the Executive Order.

In addition section 2(b) of the Order provides that during the period that the inventory ordered by section 2(a) is being completed the agencies were to exercise caution with respect to federally owned property that might qualify for nomination to the National Register. During such a period any "questionable actions" were to be referred to the Secretary of the Interior who in turn would determine whether the property was likely to meet the criteria for inclusion in the Register. If the Secretary decided the issue affirmatively, then, the agency head was to reconsider the proposal which would affect the property and if after so doing he decided to proceed with the proposal then he was obliged before implementing the proposal to submit the matter to the Advisory Council on Historic Preservation for comment. Thus, in effect, § 2(b) applied the review process afforded National Register listings by § 106 of NHPA (16 U.S.C. § 470f) to federally-owned properties eligible for inclusion in the National Register.

The Court finds that neither section 2(a) nor section 2(b) has any bearing

upon the facts of this case. First, both sections are time-limited. Section 2(a) directs that the inventory called for is to be completed by no later than July 1, 1973 and section 2(b) directs that its provisions be followed during the "interim period". Whether HUD complied with section 2(a) by July 1, 1973 seems to this Court to be inconsequential for purposes of this lawsuit since the property in question is now listed in the Register. It may be that had HUD felt itself obligated to comply with section 2(a) vis-a-vis the Courthouse it would have decided that the Courthouse did not "appear to qualify for listing" and that might have been the end of the matter. But this, of course, is wholly speculative and it would be improper to predicate this Court's ruling on a prediction as to what HUD might or might not have done. Plaintiffs' argument in this regard is therefore found unpersuasive. Moreover, it has been assumed that the Courthouse was within HUD's "jurisdiction or control" for purposes of section 2(a) and this is far from being clearly the case, particularly if this phrase was meant to include only federally owned properties. In fact, judging from the President's statement upon signing the Order this would seem to be the case. He then said: "Today I am directing Federal Agencies to begin evaluating their properties to determine which may possess historic, archaeological or architectural significance. This comprehensive evaluation of all *currently owned Federal properties* is to be completed by July 1, 1973." 7 *Weekly Comp. of Pres. Docs.* 756 (May 17, 1971) (emphasis added). In light of this the Court concludes that HUD had no "jurisdiction or control" over the Courthouse within the meaning of section 2(a).

With respect to the section 2(b) review process, that section by its terms only applies to federally-owned properties. The Courthouse has been at no time federally-owned and therefore section 2(b) of the Executive Order has no application to this case.

*The Regulations*

The Executive Order also directed federal agencies to institute procedures in consultation with the Advisory Council on Historic Preservation in order "to assure that Federal plans and programs contribute to the preservation and enhancement of non-federally owned sites, structures and objects of historical, architectural or archaeological significance." Section 1(3). In February of 1973 the Advisory Council promulgated regulations setting forth a procedure for compliance with section 106 of NHPA. 38 Fed.Reg. 5388 (Feb. 28, 1973). In January 1974 these procedures were revised to include guidelines to assist federal agencies in complying with their section 1(3) responsibility. 36 C.F.R. § 800.1 et seq. (1974).

In a footnote in its Post-Trial Memorandum of Law, HUD has briefly questioned the binding effect of these regulations arguing that at most they may be considered purely advisory as are those of the Council on Environmental Quality. *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 424 (5th Cir. 1973); *Greene County Planning Board v. FPC,* 455 F.2d 412, 421 (2d Cir. 1972), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

The functions of the Advisory Council on Historic Preservation are spelled out in § 202 of NHPA. (16 U.S.C. § 470j). This section does not explicitly state that the Council shall have authority to issue regulations which are binding on agencies. Nevertheless, the review process set forth in § 106 necessarily contemplated the issuance by the agencies of guidelines governing the procedural aspects of the process. Moreover, as has been noted, section 1(3) of the Executive Order explicitly imposed on federal agencies the affirmative duty of adopting procedures "to assure that Federal plans and programs contribute to the preservation and enhancement of non-federally owned" cultural resources.

There has been no evidence that HUD chose to independently draft its own regulations in compliance with this di-

rective. Rather, it would appear that HUD decided to rely upon and adopt the procedures suggested by the Advisory Council. Thus in HUD Handbook 1390.1 it is noted that: "Any HUD action or undertaking which has an effect on property listed on, or nominated to, the National Register of Historic Places will require Special Environmental Clearance and must comply with section 106 of the National Historic Preservation Act of 1966 *and implementing procedures.*" [8] 38 Fed.Reg. § 5(a)(6) (July 18, 1973) (emphasis added). It is true that at the time this Handbook was issued the Advisory Council Regulations contained no guidelines specifically concerned with non-federally owned properties. However, an updated version of the HUD Handbook containing the same provision was issued after the Advisory Council procedures had been revised to contain guidelines relating to non-federally owned properties.[9] 39 Fed.Reg. § 50.-11(g) (Feb. 22, 1974).

■ Given HUD's affirmative responsibility to institute its own procedures to protect non-federally owned properties of cultural significance, its apparent failure to adopt its own regulations in compliance with the Executive Order, and the provision in its Handbook that HUD must follow "implementing procedures" the conclusion is inescapable that in fulfillment of its responsibility under section 1(3) of the Executive Order, HUD chose to incorporate the Advisory Council regulations as part of its own internal procedures rather than adopt its own regulations.

■ Having adopted this course, HUD was bound to follow the Advisory Council regulations since it is axiomatic that a federal agency must be guided by the terms of its own regulations. *Smith v. Resor,* 406 F.2d 141, 145–46 (2d Cir.

1969); *Wilson v. Lynn,* 372 F.Supp. 934, 937 (D.Mass.1974); *Silva v. Romney,* 342 F.Supp. 783, 785 (D.Mass.1972).

In pertinent part these regulations provide that the agency head "[a]t the earliest stage of planning or consideration of a proposed undertaking" or as "early as possible and in all cases prior to agency decision concerning an undertaking" is to identify properties within the undertaking area "that are included in or eligible for inclusion in the National Register." 36 C.F.R. § 800.4. Once having identified these properties he is to determine whether the undertaking has an effect upon the property. § 800.-4(b). If an adverse effect is found the agency official shall, inter alia, "[r]equest in writing the comments of the Advisory Council." § 800.4(e)(1).

Concededly the federal agency has not followed these regulations since it is HUD's position that they are inapplicable to the proposed demolition in view of the fact that HUD's approval of the expenditures for such demolition occurred in July 1965. It is argued that HUD's undertaking with respect to the Courthouse has never been changed and that there has been no occasion since the date the contract was executed when the exercise of HUD authority could have altered the proposed action with respect to the Courthouse.

The regulations define "undertaking" to mean "any Federal action, activity, or program, or the approval, sanction, assistance, or support of any other action, activity, or program." § 800.3(c). The regulations also provide that the term "undertaking" is to include not only new but also "continuing projects and program activities . . . supported in whole or in part through Federal contracts, grants, subsidies, loans, or other forms of funding assistance . . . ."

---

**8.** The section thereafter made specific reference to Appendix L of the Handbook. This appendix consisted of the regulations issued by the Advisory Council on Historic Preservation. There is no question, therefore, that the "implementing procedures" alluded to were those promulgated by the Advisory Council.

**9.** The Court also notes that in October 1974 HUD again made the regulations part of its own internal provisions concerning applications for financial assistance under Title I of the Housing and Development Act of 1974. 39 Fed.Reg. 36554, § 58.24 (Oct. 10, 1974).

*Id.* Clearly, the proposed demolition of the Courthouse is an "undertaking" within the meaning of these regulations. Unlike section 106 of NHPA the applicability of the regulations is not expressly linked to the timing of the approval of the Federal expenditures. Rather, the regulations require agency officials to take certain steps "[a]t the earliest stage of planning or consideration of a proposed undertaking" or "[a]s early as possible and in all cases prior to agency decision concerning an undertaking." The word "decision" is defined to mean "the exercise of agency authority at *any* stage of an undertaking where alterations might be made in the undertaking to modify its impact upon historical and cultural properties." § 800.3(g) (emphasis added).

 From the language of this section it would seem that the regulations were meant to apply at any time when it was still possible to effect changes in the undertaking in order to circumvent an adverse impact.

The Court notes that throughout these proceedings there has been no claim that it would not be possible to change the proposed demolition. In fact, the Urban Renewal Agency has implicitly admitted such a possibility since it took the time to investigate the costs connected with alternative dispositions of the Courthouse, such as renovation or removal of the oldest structure of the complex to another location. This action would have been pointless had the Agency felt that its options with respect to the Courthouse were entirely foreclosed.

Yet HUD claims that it has no authority in this matter because *its* options were foreclosed at the time it approved the overall urban renewal project. The Court believes that this may be too narrow a view of HUD's authority.

Under section 108 of the 1965 Loan and Grant Contract,[10] HUD has very broad powers with respect to "proposed actions". In particular, under section 108(16) the Agency must submit to HUD "[d]ocumentary data covering its proposed clearance of buildings and struc-

tures from the Urban Renewal Area and covering its proposed utilization or disposition of such buildings and structures." Section 108(B) further provides that the Agency may not proceed with the proposed action until it has received written authorization from HUD that it has no objections. Should the Agency implement the proposed action without having received such notice of authorization from HUD then "[n]otwithstanding any other provisions of the Contract, [HUD] may elect not to make any requested payment on account of the Project Temporary Loan, any Project Definitive Loan, or the Project Capital Grant . . . ." Finally, section 108(B) specifically states that its purpose is "to insure that the Local Public Agency shall not take any step which might . . . violate applicable Federal laws or regulations . . . ."

Given the broad and sweeping language of this section and its clearly stated purpose, it is difficult to understand HUD's claim that its options with respect to the demolition of the Courthouse were totally and irrevocably foreclosed in 1965 when the Loan and Grant Contract was executed. Indeed, it could reasonably be argued that under section 108 of the Contract HUD not only has the authority to review proposed actions but even the affirmative obligation to insure that in carrying out proposed actions the Agency does not "violate any Federal laws or regulations."

 In short, what this Court has decided is that in light of section 108 of the Contract and the fact that when the regulations were issued in 1974 the proposed demolition of the Courthouse had not reached such a plateau of implementation that reassessment of the action by all concerned would be wholly impracticable, the plaintiffs, with respect to the applicability of these regulations, have shown both "probable success on the merits" and "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Gresham v. Chambers, supra.*

**10.** Def. HUD's Exh. C.

*Applicability of NEPA and HUD's Implementing Procedures*

The National Environmental Policy Act (42 U.S.C. § 4321 et seq.) extends its procedural protections both to natural and cultural resources. The congressional declaration of national environmental goals provides:

" . . . it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—. . . preserve important *historic, cultural,* and natural aspects of our national heritage . . . ." (42 U.S.C. § 4331(b)(4)) (emphasis added).

This legislative purpose has received judicial recognition and implementation. In *Ely v. Velde,* 451 F.2d 1130, 1132 n.4 (4th Cir. 1971), for example, the Court found that "NEPA expresses a strong federal policy in favor of preserving the natural environment, including our 'historic and cultural heritage.'"

While enacted on January 1, 1970, it is clear that NEPA may be applicable to projects on-going at the time of its enactment provided the Federal agency thereafter has remained meaningfully involved in its implementation. *Jones v. Lynn,* 477 F.2d 885 (1st Cir. 1973); *Boston Waterfront Residents Ass'n v. Romney,* 343 F.Supp. 89 (D.Mass.1972). But see *San Francisco Tomorrow v. Romney,* 472 F.2d 1021 (9th Cir. 1973).

HUD has argued that no federal action with respect to the Courthouse has occurred since 1965 when the demolition plan was approved and that therefore NEPA is inapplicable. However, this restrictive position overlooks the fact that the proposed demolition is a concededly important segment of a large urban renewal plan in which the federal government is intimately involved by virtue of its financial backing. See *Boston Waterfront Residents, supra.* To view the proposed demolition as an isolated act independent of the broader context in which this action is being taken would appear to be an unsatisfactory method of determining the presence of federal involvement. There is no question that HUD continues even now to be meaningfully involved in the White Plains Urban Renewal Plan. Proposed changes in the Plan must still be approved by HUD. The Loan and Grant Contract provides that HUD has the power to withhold any future payments or guarantees if any of several proposed actions by the Urban Renewal Agency fail to satisfy HUD. See section 108 of the Contract. Indeed the parties agree that the proposed sponsor for the development of the Courthouse site is yet to be approved by HUD. Also, it appears that as of February 3, 1975, HUD still had not disbursed some $20,757,343 of its total capital grant of approximately $55,000,000 to the Agency. Furthermore, HUD has guaranteed an outstanding Agency loan of $36,000,000 which matures May 16, 1975. (Giacopino Affidavit dated Feb. 3, 1975.) Should the Agency be unable to pay this loan in full on that date, HUD may be called upon to extend its guarantee in order to permit the refinancing of the loan. Moreover, although HUD approved the $3.5 million purchase price for the Courthouse, it must still reimburse the Agency for any difference between that cost and the HUD-approved sale price to a private developer. (Stipulation of Facts, # 8.) HUD has also approved a $49,000 demolition contract for the Courthouse, which amount is eligible for HUD reimbursement as a project cost under the Grant. In short, seen from an overall perspective, this Court cannot find that NEPA is inapplicable to a proposed demolition—which is part of an Urban Renewal Project in which the federal government is still substantially involved—merely because the proposed action was originally approved by HUD in 1965. On the contrary the Court finds that the provisions of NEPA are applicable to such action.

■ Section 102 of NEPA in part requires that before taking "major Federal actions significantly affecting the quality of the human environment," all federal agencies must, "to the fullest extent possible" prepare a "detailed statement" (environmental impact statement) (EIS) which shall analyze, inter alia, the environmental impact of the proposed action and alternatives to such action. 42 U.S.C. § 4332. The Court is aware that the federal agency involved is the initial party authorized to make the "threshold determination" whether there is major federal action significantly affecting the quality of the human environment. *Hanly v. Mitchell,* 460 F.2d 640 (2d Cir. 1972), *cert. denied, sub. nom. Hanly v. Kleindienst,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (*Hanly I*). In *Hanly I* the Court noted that there was a twofold determination that had to be made: (1) whether there was "major federal action", and (2) whether such action "significantly" affected the environment. The Court also stated that "the responsible federal agency has the authority to make its own threshold determination as to each in deciding whether an impact statement is necessary." *Id.* at 644.

With respect to the project as a whole HUD has recognized that in connection with its approval of the 1972 amendatory to the 1965 Loan and Grant Contract it was required under its own regulations to prepare an environmental clearance. Having failed to do so at the time of such approval HUD undertook to prepare this clearance shortly after this litigation commenced. This Special Environmental Clearance[11] was completed on January 16, 1975. In it HUD concluded that no EIS was required in connection with the 1972 changes. With respect to the proposed demolition, HUD simply found that its options had been foreclosed by the approval of the contemplated action in 1965.

■ In this Court's judgment this "threshold determination" as far as the Courthouse is concerned appears to be both substantively and procedurally defective.

■ *Hanly v. Mitchell, supra,* (*Hanly I*) instructs us that in reaching its "threshold determination" the federal agency must make an adequate record to support its conclusions. *Id.* at 647. Further, federal agencies have been cautioned that "perfunctory and conclusory language" will not serve to support this determination. The Court finds that HUD appears to have failed to heed these admonitions. Here the Courthouse was found to be "subject to HUD environmental review to the extent that administrative regulations implementing NEPA require that new conditions be taken into account when updating environmental clearances." (Special Environmental Clearance, Def. HUD's Exh. D, Section G, *Historic Preservation.*) The Special Environmental Clearance also noted that it was to "include an evaluation of the originally approved proposal for demolition of the Courthouse." (Exh. D, *Purpose of Clearance.*) Nevertheless, in spite of this recognized need for "an environmental review" and "evaluation" of the proposed demolition, it was concluded that as far as HUD was concerned the proposed demolition was unavoidable since HUD's options in this respect had been foreclosed once the demolition was approved in 1965.

Given this conclusion it would appear that the "environmental review" and "evaluation" constituted a meaningless and futile exercise with no discernible purpose other than to give lip service to the provisions of NEPA and HUD's implementing procedures. It would seem that if an "environmental review" of the demolition was called for under the regulations it would be designed to achieve some potentially fruitful result. Compliance merely for the sake of technical compliance would be unreasonable and wasteful. Not surprisingly, HUD's own regulations furnish no basis for such a hollow gesture. In particular, section

---

**11.** See note 4, *supra.*

5(a)(4) of HUD's Handbook 1390.1 provides:

> "*Retroactivity.* To the maximum extent practicable, environmental clearance shall be required for uncompleted projects which have never gone through an environmental clearance under NEPA, at such time as a subsequent significant HUD action, such as the next stage of program approval or approval of a major amendatory, is proposed. Where it is not practicable to reassess the basic course of action, major attention should be given to measures, which, given the stage of project completion, may reduce adverse environmental impact. It is also important in taking further action that account be taken of environmental consequences not fully evaluated at the outset of the project." 38 Fed. Reg. 19182, 19185 (July 19, 1973).

This section clearly mandates a meaningful environmental review "to the maximum extent practicable" rather than a perfunctory evaluation. The section also appears to prescribe that alternatives to the proposed action must be considered when engaging in the review process. Moreover, it would seem that quite apart from this provision, a federal agency must assess alternatives to the proposed action in making its "threshold determination". *Hanly I, supra,* 460 F.2d at 648. See also 42 U.S.C. § 4332(2)(D).

Here the Special Environmental Clearance had no meaningful discussion of currently feasible alternatives to demolition, if any, since HUD concluded that it was powerless to compel the Urban Renewal Agency to adopt an alternative course of action. Testimony from a HUD official during the hearing was to the same effect. (Transcript at 172–73.) But this approach takes a very limited view of HUD's responsibilities. At a minimum HUD could have solicited and investigated the feasibility of alternative proposals, and after reasonable consideration thereof, could then have taken an informed position with respect to the proposed demolition. Instead, HUD has adopted a "hands-off" policy which leaves the decision as to the fate of the Courthouse solely in the hands of local officials and agencies. In this Court's view, such a policy is not consonant with the requirements of NEPA and HUD's own implementing procedures. As for HUD's view that it has no power whatsoever to alter the demolition plan, an analysis of the 1965 Contract and in particular section 108(B) could lead one to conclude otherwise. Whatever the determination to that question may ultimately be, HUD, in making its "threshold determination", has wholly failed to give sufficient and appropriate study to possible alternatives.

In addition the Court finds that the "threshold determination" is deficient in another serious respect. In *Hanly v. Kleindienst,* 474 F.2d 823, 836 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (*Hanly II*) the Court stated: "[B]efore a preliminary or threshold determination of significance is made the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision." This Court recognizes that in *Hanly II* the Court was concerned with a "threshold determination" on the question of whether the admittedly major federal action would "significantly" affect the environment. In this case, on the other hand, the determination appears to have been that there was no major federal action. Nevertheless, under the circumstances of this case, in this Court's judgment, the *Hanly II* requirement applies with equal force. HUD was, of course, well aware that the proposed demolition was being litigated before this Court. Indeed, it could reasonably be argued that the Special Environmental Clearance was prepared with this lawsuit in mind. HUD, therefore, knew that in the opinion of a segment of the White Plains community the proposed demolition was ill-advised. Under these circumstances HUD should have afforded the public—and in particular the

plaintiffs here—a reasonable opportunity to present their views on the matter. Such an opportunity might well have resulted in the disposition of this litigation had the plaintiffs been persuaded that, in fact, there were no reasonably feasible alternatives to the proposed demolition. Moreover, such an airing of views might have led to an acceptable alternative thereby breaking the impasse. HUD chose not to engage in this informal consultation process. In this Court's view, the failure to afford the public an opportunity to comment on the issue in question violated the spirit if not the letter of the *Hanly II* directive and to that extent the "threshold determination" would appear to be inadequate.

In light of the foregoing the Court concludes that the plaintiffs have made the necessary showing sufficient to support the granting of preliminary relief with respect to the inadequacy of the "threshold determination" made by the federal agency that no EIS was required.

*Potential Harm*

As previously noted, plaintiffs must establish under either of the two standards governing the granting of preliminary injunctive relief possible irreparable injury or a balance of hardships tipping decidedly in their favor.

 Unquestionably irreparable injury would occur from the plaintiffs' viewpoint should the proposed demolition be permitted to go forward. As another Court has said "the act of demolition is irrevocable. Consideration of alternative plans . . . is permanently foreclosed once [the structures] have been razed." *Boston Waterfront Residents Ass'n v. Romney,* 343 F.Supp. 89, 91 (D.Mass.1972). On the other hand the Urban Renewal Agency has contended that to delay the demolition would cause serious financial problems. It is claimed that if "a preliminary injunction is ordered there is a real danger that damages will accrue to the Agency well in excess of $1,000,000." (Allebach Affidavit filed December 31, 1974 at 13.)

While it is not clear how this figure was arrived at it may be said to include minimally: (1) costs incurred to provide security for the Courthouse; (2) potential liability to the contractor who was awarded the demolition contract; and (3) expenses incurred due to the resultant delay in the development of parcels adjacent to the Courthouse site by virtue of the fact that such development is dependent on the demolition of the Courthouse. Other less precise elements of potential damages have also been presented.

Having carefully weighed the factors presented by the defendant Agency, this Court must conclude that the potential harm to it present here does not suffice to prevent the issuance of a preliminary injunction. First, the plaintiffs have posted an initial security of $7,000 to cover the costs of protection and preservation of the structure and that amount is to be increased monthly by $4,000 during the term of the order. Secondly, the delay caused by the issuance of a preliminary injunction herein may be of comparatively short duration with a resultant decrease in the damages claimed. There is no reason to believe, should compliance with the prescribed procedures be ultimately ordered, that the process cannot be accelerated. Thirdly, no evidence has been submitted to support a finding that the development of adjacent sites must come completely and totally to a halt should the demolition of the Courthouse be temporarily enjoined. Fourthly, many of the costs cited by the defendant are predicated on the assumption that the Courthouse will not be demolished. But that is not the issue before this Court. It may well be that it will be finally determined that the Courthouse must indeed be demolished. Finally, the Second Circuit has recently indicated that "despite the substantial additional costs which would be caused by court-ordered delay" public interest considerations may support the issuance of a preliminary injunction. *Steubing v. Brinegar, supra* at 497. The Court finds that the public interest present here—

not permitting action by governmental agencies which may be in contravention of statutory and regulatory procedures designed to protect the cultural environment—outweighs the costs that may be incurred as a result of the delay brought about by a preliminary injunction.

*Propriety of Enjoining the Local Agency*

While the obligations required by NEPA and the regulations promulgated by the Advisory Council on Historic Preservation are not imposed on the local agency, this Court believes that it has the power to restrain the proposed demolition of the Courthouse by the Agency. *Biderman v. Morton,* 497 F.2d 1141, 1147 (2d Cir. 1974); *Jones v. Lynn,* 477 F.2d 885 (1st Cir. 1973); *Boston Waterfront Residents Ass'n, supra; Thompson v. Fugate,* 347 F.Supp. 120 (E.D.Va.1972). See *Silva v. Romney,* 473 F.2d 287 (1st Cir. 1973). But see *Ely v. Velde,* 451 F.2d 1130 (4th Cir. 1971). As the Court stated in *Silva, supra,* "it is 'beyond challenge' that one in partnership with the federal government can be prohibited from acting in a certain manner." *Id.* at 289–90. Here the planning and implementation of the urban renewal plan has taken place with the major assistance of the federal government. The local agency has received substantial amounts of federal funds and additional funds are yet to be disbursed. In addition, HUD has continuing monitoring responsibilities to insure that the plan is properly carried out. Given the lengthy, extensive and close-working relationship between HUD and the local agency in the execution of the plan, it can be said that they have become "partners" in the implementation of the project. Hence the local agency may be reached by a preliminary injunction issued by this Court.

The Agency has argued that the issuance of a preliminary injunction would violate its constitutional rights in several respects. The Court has examined the authorities cited in support of this proposition and has found them inapposite. It is difficult to see how temporarily restraining the Agency from proceeding with the proposed demolition raises questions of constitutional import within the context of the circumstances presented here.

## CONCLUSION

The Court concludes that plaintiffs have demonstrated under either of the two standards for preliminary relief that they are entitled to an injunction. Accordingly, defendants' motions to dismiss the complaint for failure to state a claim are denied and plaintiffs' motion for preliminary relief is granted. A preliminary injunction will issue restraining defendants from proceeding with the proposed demolition. Security shall be the same as that presently in effect in connection with the Temporary Restraining Order. The provisions of the TRO will remain in effect pending the filing of the Preliminary Injunction.

Submit Order by no later than March 10, 1975 on one day's notice.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Fed.R.Civ.P.

SO ORDERED.